**MARY AND CRYSTAL, Plaintiffs–Appellees, Cross–Appellants,**

v.

**Gerard RAMSDEN, James Matthews, Edwin Morse, and Patricia Batterman, Defendants–Appellants, Cross–Appellees.**

Nos. 78–1954, 78–1955.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 3, 1979.

Decided Nov. 21, 1980.

As Amended Nov. 24, 1980.

James H. Petersen, Wisconsin Dept. of Justice, Madison, Wis., for defendants--appellants.

Thomas E. Dixon, Madison, Wis., Harry F. Peck, Milwaukee, Wis., for plaintiffs--appellees.

Before FAIRCHILD, Chief Judge, SWYGERT, Circuit Judge, and EAST, Senior District Judge.*

FAIRCHILD, Chief Judge.

On May 27, 1977 plaintiff-appellee and cross--appellant Mary brought this action under 42 U.S.C. §§ 1983 and 1988 on her own behalf and as representative of a class of residents of the Goodland State Camp, a Wisconsin juvenile correctional institution, seeking declaratory, injunctive, and monetary relief. Plaintiff Crystal was permitted to intervene in October, 1977. The complaint claimed among other things, that isolation imposed as discipline was cruel and unusual punishment, and that the discipline was imposed without due process.

The named defendants were Manuel Carballo, then Secretary of the Wisconsin Department of Health and Social Services, Allyn Sielaff, Administrator of the Division of Corrections, and Gerard Ramsden, Superintendent of Goodland State Camp. By subsequent amendment of the complaint, James Matthews, Superintendent of Wisconsin Correction Camp System, Gerard Ramsden's supervisor; Andrew Basinas, Di-

* Senior District Judge William G. East of the District of Oregon is sitting by designation.

rector of the Bureau of Institutions, James Matthews' supervisor; Edwin Morse, a consultant to the Division of Corrections and Mary's treating psychologist; and Patricia Batterman, the Goodland Camp social worker, were added as defendants.

On August 9, 1977 the district court certified this action maintainable as a class action pursuant to Rule 23(c)(1) of the Federal Rules of Civil Procedure and Mary's adequacy as representative of that class. In January, 1978, however, Goodland State Camp was closed, thereby releasing the inmates into other settings and rendering injunctive relief moot.

The money damage claims of Mary and Crystal were tried to a jury in March, 1978. The court submitted a carefully constructed form of special verdict.

The court answered certain questions as a matter of law finding that Matthews and Ramsden denied Mary and Crystal the right of each to present evidence in her behalf, other than her own testimony, at the disciplinary hearing, and finding that Batterman denied Crystal such right. Although the jury found that the denial caused injury to Mary and Crystal, and determined the amount of damages at $500 for Mary and $300 for Crystal, the court changed the answers on motion after the verdict so as to find that the denial did not cause injury, but that the sum of $1 should be awarded simply because of the denial of said right. These changes were made to conform to *Carey v. Piphus*, 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978). The court did not submit the question of good faith in such denial but determined as a matter of law that each defendant should have known that the law required this opportunity or present evidence. The $1 awards were reflected in the judgment.

As to each plaintiff, the jury found that considering the length and conditions of her confinement in the security section, her confinement constituted cruel and unusual punishment; found that Matthews and Ramsden caused such imposition of punishment on both plaintiffs and Batterman caused it on Crystal; that Matthews and

Ramsden did not act in good faith in imposing it, but Batterman did; that the cruel and unusual punishment caused injury to both plaintiffs; that the amount of money which would reasonably compensate Mary was $2,400, and Crystal $1,600.

The jury also found that Morse caused cruel and unusual punishment to be imposed on Mary by refusing her request to be seen by him; that he did not act in good faith in so doing; that his refusal caused Mary injury; that the sum of $2,900 would reasonably compensate her for the injury.

Judgment was entered that Mary recover $2,401 of the Matthews and Ramsden and $2,900 of Morse; that Crystal recover $1,600 of Matthews and Ramsden and $1 of Matthews, Ramsden, and Batterman. Defendants Carballo, Sielaff, and Basinas were dismissed. The judgment was made final in compliance with Rule 54(b), F.R. Civ.P., claims for declaratory relief not having been determined.

The district court awarded $20,125.77 attorney fees to plaintiffs. Some of plaintiffs' attorneys were employed by Youth Policy and Law Center, Inc., financed by government and other contributions. The court reduced the otherwise reasonable rates for these attorneys by 40% because of the absence of overhead such as would be incurred in private practice. The reduced figure for these lawyers and the otherwise reasonable compensation of plaintiffs' counsel in private practice were further reduced by 40% "to bring the total compensation allowed into more reasonable relationship with the [modest] monetary recovery in the case."

The court also awarded attorney fees of $1,546.78 to defendants Carballo and Basinas because the court deemed it unreasonable for plaintiffs to seek money damages from them and to fail to dismiss as to them as the case progressed, there being no evidence to show that they had been personally involved in the conduct complained of.

On appeal, defendants challenge the court's instructions on several subjects, certain rulings as a matter of law, the suffi-

ciency of the evidence in only two particulars, and error in receiving a document as evidence. Plaintiffs, on their appeal, challenge the reduction in attorney fees allowed them, and the award of attorney fees to Carballo and Basinas.

## I. Background

Most of the facts are undisputed. Mary (aged 17) and Crystal (aged 16) were placed in isolation following infractions of rules while residents at Goodland State Camp, a facility for delinquent female juveniles. Mary was accused of two attempts to escape, assault on a staff person, and not yielding to a command, all while returning from a visit to a doctor. Crystal was accused of cutting a hole in the security screen of a window in an attempt to escape.

Both girls were given hearings in accordance with institutional procedures.[1] Mary appeared alone before a committee of three staff members who questioned her about the incidents. Mary acknowledged the two escape attempts but denied the assault. Ken, the staff person involved in the incident, also presented his version of the events. The Committee concluded that Mary should be punished by fifty days in isolation for the escapes, assault, and failure to yield to a command, with the remainder of her institutional stay to be served in the regular wing. Mary actually served approximately twenty–nine days of her sentence. Crystal also appeared alone before a disciplinary committee. Defendant Batterman was chairman. Crystal was sentenced to twenty days in isolation and actually served nineteen days.

The stipulated facts show that the solitary (or security) rooms were approximately seven and one–half feet by eleven feet with the following characteristics:

"The rooms contain a louvered window which could only be opened by staff with a special cranking device available to them. A security screen covered the outside of the window. The room contained only a metal frame bed and a mattress and, except in unusual circumstances, bedding. The door to the solitary room is a heavy thick door with three large separate locks and a small observation window measuring approximately four inches by five inches.

1. The parties stipulated as follows:
"The Goodland State Camp staff used the following procedure in making most of the solitary room placements. The staff person who had observed or been involved in the incident submitted a report to a three–person panel. This panel was responsible for determining whether the girl would be punished for the incident and what the punishment would be. Often, punishment was placing the girl in a solitary room. The accused girl could appear before the panel and state her version of the incident. They were not given written rules for the conduct of the hearing or written procedures for appealing a decision of the three–person panel.
"The following notation was posted in the day room:
'Step I: The Disciplinary Committee shall consist of three staff members. The social worker will be the chairman of the committee. The Corrections Officers, teachers and recreation director will fill the other two committee positions on a rotating basis. In no case will the officer who initiated the report be on the committee. The Disciplinary Committee will conduct their hearing on the first regularly scheduled workday after the conduct report is written. Whenever a resident is locked in a disciplinary room awaiting the committee hearing, that resident will be given credit for the time spent in the disciplinary room.
'In holding the hearing, the Disciplinary Committee will take a statement from the resident and interview any other witnesses deemed necessary to make an accurate finding on the conduct report. The committee then enters a [judgment] as to the resident's guilt or innocence and determines what the penalties will be. All committee members should sign the conduct report and a copy should go the resident. The original copy of the conduct report goes in the Superintendent's mail box.'
[Step II related to appeal to the Camp Superintendent, and an additional paragraph covered other procedural matters.]
"Girls accused of misconduct were not allowed to have an advocate at the hearing, were not allowed to have their own witnesses at such a hearing (although the committee did sometimes interview other persons involved in the incident), and were not given the opportunity to confront any witnesses against them. Those girls already in a solitary room who appeared in person saw the committee wearing the pajamas that girls in solitary rooms were required to wear."

"The residents in solitary rooms were not allowed access to television, radio, record players or smoking materials. They were required to receive their meals in their rooms. They were not allowed to communicate with any of their peers while in solitary rooms. Girls not in solitary rooms were informed that they should not communicate with a girl who was in a solitary room. Every attempt was made by the Goodland staff to totally clear the halls when residents in solitary rooms were taken to the bathroom in order that the girls would not engage in conversation with other residents. Institutional policy was that no phone calls were allowed to girls in solitary rooms. Visitation was restricted to parents. Many of the girls did not have parents who could or would visit them. The girls in solitary rooms were required to wear pajamas twenty–four hours per day. It was Goodland State Camp policy that they were allowed a bathroom visit every two hours except between 11:00 p. m. and 7:00 a. m. in the morning. During the hours between 11:00 p. m. and 7:00 a. m., girls in solitary rooms were usually allowed a bathroom visit upon need. A covered pot was placed in the room for elimination purposes when they were not allowed to go the bathroom.

"Prior to June 3, 1977, the girls were in the solitary rooms for twenty–four hours per day with the exception of the bathroom and shower visits. Subsequent to June 3, 1977, they were allowed out for one hour per day but were not allowed to commingle with other residents. Books and reading materials were given to the girls in solitary rooms only upon request. In at least one instance, this request was denied. The parties disagree as to the motivation for the denial. Girls' requests to clean their rooms were denied on occasion. The parties disagree as to the motivation for the denial."

Mary remained in the initially assigned security room from May 5, 1977 to May 25, 1977, at which time she was placed in a room with more furniture. On May 29 she was transferred to a regular room, but with restrictions as to outside activities.

At trial Mary testified that her stay in isolation was made particularly difficult by the fact that her treating psychologist refused to visit her until the day before her release. She experienced frustration at not being able to talk to anyone and complained of physical discomfort which a staff nurse attributed to be a side effect of isolation. In addition, Mary testified that the isolation room was very hot, with an unshaded window, poor ventilation and insect infestation. On one occasion after the room was sprayed with pesticide, Mary was required to remain in the room despite the noxious vapors. Mary's requests to clean her room and to be able to pick out some reading material from the book rack were denied.

Throughout her confinement in isolation Mary kept a diary which was admitted as a plaintiff's exhibit at trial.

Crystal's stay in isolation was more difficult. She was upset and frightened from the beginning. She cried for prolonged periods. She threw her bed around to express her anger and tore her towel to use in a suicide attempt. Her bed and linens were removed as punishment for this conduct and as a preventive measure. The bed was returned later the same day. During this troubled period Crystal refused to talk to defendant Batterman, her social worker. Crystal was not visited by a psychiatric therapist until the fourth day in isolation and thereafter once a week. Crystal was required to serve nineteen out of twenty days in isolation despite the effect such confinement was having on her.

Crystal also testified that the condition of her room included insect infestation and that she was required to return to her room immediately after pesticide spraying.

Plaintiffs produced several witnesses, expert in relevant fields, who testified that isolation cannot be considered treatment, that long–term isolation is ineffective as punishment; that it has damaging and degrading effects; and that children or adolescents are particularly vulnerable to the negative effects. There was also expert

medical testimony as to the harmful and painful effects of the experience on plaintiffs. A manual of the Wisconsin Department of Corrections provided that separation from general population should be of relatively short duration.

## II. Instructions on Cruel and Unusual Punishment

Both sides requested instructions on this subject. The court devised its own and presented them to counsel in conference in advance of argument. It received and preserved objections made by counsel at that time, following the practice approved in *United States v. Hollinger*, 553 F.2d 535 (7th Cir. 1977).

The court gave the following instruction:

"... In considering whether either plaintiff was subjected to cruel and unusual punishment, you should bear in mind there is no issue raised in this case concerning the fact that either plaintiff was confined in Goodland Camp generally or that either plaintiff was confined in the so–called C–wing of Goodland Camp generally. Obviously, such confinement in itself causes a certain degree of pain and suffering to the inmates, including persons like Mary and Crystal, but they make no claim in this lawsuit that it was unlawful to inflict upon them whatever degree of pain or suffering was associated with their confinement generally in the Camp and in C–wing generally. Rather, what is at issue here is the additional pain and suffering, if any, which she experienced as a result of the confinement in the security section which was imposed upon them because they were believed to have violated the internal rules of Goodland Camp. It is this additional pain and suffering caused by the confinement in the security section within the Camp, if additional pain and suffering did in fact occur, which is claimed to have constituted cruel and unusual punishment.

"There are two major ideas included within the term cruel and unusual punishment. One is that a particular form of punishment is cruel and unusual if it makes no measurable contribution to acceptable goals of punishment and hence amounts to purposeless and needless imposition of pain and suffering. The second is that a particular form of punishment is cruel and unusual if it is grossly out of proportion to the severity of the conduct resulting in the punishment.

"In this case, there is some conflict in the evidence concerning the frequency of the contacts between the plaintiffs and staff members while plaintiffs were confined in the security section and also concerning the nature and quality of those contacts. It will be your task to resolve those conflicts in the evidence. But except for this matter of the contacts with staff members and except for a few other points, there is little, if any, factual conflict about the nature of the incidents which prompted the disciplinary proceedings. That is the violation of the rules that these two plaintiffs were believed to have committed. There is little, if any, factual conflict about the nature of those incidents which prompted the disciplinary proceedings, or about the manner in which the disciplinary proceedings were conducted, or about the length of time each plaintiff then spent in the security section, or about the size or appearance of the security rooms, or about the furnishings within those rooms, or about the limits upon the plaintiffs' opportunity to see or hear or communicate with other persons, or about the other attributes of their confinement in the security section.

"In deciding whether the punishment imposed upon either plaintiff was cruel and unusual, you are to take into account the following considerations: The age of the particular plaintiff; the nature of the misconduct which prompted the decision to place the particular plaintiff in the security section; what was known about the particular psychological and emotional condition of each plaintiff at the time of the decision to confine her in the security section; the care with which the effects of the confinement in the security section upon the particular plaintiff were

observed as that confinement proceeded; the nature and extent of injury, if any, which the particular plaintiff sustained as a result of confinement [; the degree to which such injury, if any, could have been foreseen; and the relationship of the imposition of confinement] [2] in the security section to the general purposes and program of the camp.

"Now in the course of deciding whether either of these plaintiffs was subjected to cruel and unusual punishment, you are to bring to bear your understanding of the standards of decency and respect for human dignity accepted in our society here in the United States as of May and June, 1977."

Defendants argue several claims of error, some of which are foreclosed by failure to state an objection.

a. Defendants point to the language directing the jury to consider what was known about the psychological and emotional condition of each plaintiff as well as the degree to which any injury sustained by each plaintiff could have been foreseen. Defendants argue that this language imports consideration of "subjective effects." They seem to say that insofar as the extent of pain inflicted may be significant, it should be determined "objectively" in terms of .individuals generally, without considering the effect on unusually sensitive persons. The record shows that defendants made no objection to this language in the instructions at either of the opportunities given by the court.

b. Defendants point to the same language as in "a.", and also that pertaining to the care with which the effects of the confinement were observed. They argue that a negligence concept is erroneously applied. Again, there was no objection on this score.

c. Defendants had requested two instructions which contained one paragraph, among several, as follows:

"In considering what constitutes the public's idea of gross disproportionate severity, the legislative attitudes, history,

views of corrections officials and the national acceptance of the use of security rooms and isolation are of some weight and importance."

■ Counsel for defendants objected "to those aspects of the Defendants' instructions that were submitted concerning cruel and unusual punishment that were not included in the Court's." On appeal, defendants argue that it was erroneous not to tell the jury "to consider those traditional criteria utilized to ascertain cruel and unusual punishment, viz, the acceptance of the form of punishment nationally or internationally, the view of corrections officials as to its use, the history of the punishment form, and the like."

It is true that some of the witnesses referred to the use of isolation in juvenile facilities in other states. Several were highly critical of such use. There was no testimony to indicate that isolation for periods of time comparable to those in this case was accepted elsewhere. Defendants developed no line of testimony showing degree or extent of acceptance elsewhere, and did not argue the point to the jury. As already noted, a manual of the Department stated that separation of individuals from general population should be of relatively short duration. Several witnesses testified that the twenty- -day and fifty--day periods involved in this case would not be deemed relatively short.

Even assuming that defendants' objection to the omission of this concept from the instructions was preserved, the state of the evidence did not entitle them to its inclusion.

e. Defendants point to the reference to "acceptable goals of punishment" and claim error in the failure to define such goals. Again, there had been no objection on this ground. Moreover, an instruction requested by the defendants used the same phrase, without definition.

### III. Arguments of Defendant Morse

Morse claims that it was error to deny his motion for dismissal at the close of the

---

**2.** The briefs and appendix include the bracketed material; the transcript does not.

plaintiff's case, and his motion for directed verdict at the close of the evidence. We do not agree.

Dr. Morse is a psychologist. He was not an employee of the State, but rendered services under contract with it. He had treated Mary professionally while at Goodland, seeing her on a weekly basis. On her second day of isolation, Mary asked to see him, but received no answer. Some time later on a trip to the bathroom, she met him by chance, and asked if he had gotten her message. Morse replied that he had received it, but "chose" not to see her. These facts were in the record before the close of plaintiff's case, as well as expert testimony relating feelings of depression and desperation to the lack of supportive human contact.

■ There was further relevant testimony before the close of all the evidence. At either stage we think there was evidence to support the finding of the jury that Morse caused cruel and unusual punishment to be imposed on Mary by refusing her request. Clearly, Morse's suspension of his regular program of treatment of Mary at a time she was deprived of all but minimal human contact, his ignoring her request until their fortuitous meeting, and his response at that time that he chose not to see her, could reasonably be found an intentional, needless infliction of pain.

■ Defendant Morse argues that the court should have instructed as to his duty to Mary. He did not request the instruction. Although the court's instruction on cruel and unusual punishment did not refer to Morse's refusal to see Mary, it seems evident that the jury, in answering the question as to Morse, would consider the principles stated by the court so far as they appeared applicable. We do not agree with defendant that it was plain error not to tailor an instruction to the accusation against Morse and his relationship to Mary.

■ Defendant Morse argues that the jury was permitted to compensate Mary twice for one injury, apparently on the theory that Morse's refusal was just one of the conditions of her confinement. To the contrary, the special verdict and instructions clearly contemplated that any finding of injury resulting from Morse's refusal, and the amount of compensation therefor, were distinct from any finding of injury resulting from the confinement, and the amount of compensation therefor. There is nothing to suggest that the jury understood the matter differently.

## IV. Claimed Error in the Good Faith Instruction

The jury was asked whether each defendant who was found to have caused cruel and unusual punishment to be imposed had acted in good faith.

In connection with those questions, the Judge instructed:

"In considering whether a particular defendant acted in good faith belief that his or her acts were lawful, you must consider two factors.

First, you should consider whether the defendant has asserted his or her belief that the acts were lawful. And second, you must consider whether the defendant was reasonable in this belief. First, whether the defendant did believe that the acts were lawful and second, whether that belief on the part of the defendant was reasonable."

On appeal defendants argue that the instruction should have specified a standard by which to gauge whether the defendants' beliefs were reasonable. They suggest that there should have been an explanation of "the state of the law on cruel and unusual punishment," outlining the practices which had been held to be or not to be cruel and unusual punishment. Judge Doyle asserted that this would be an unmanageable undertaking in a jury trial, and that insofar as "the good faith defense turns upon the state of either Federal or State Law that aspect of the good faith defense must be resolved exclusively by the Court." Apparently as to the cruel and unusual punishment phase of the case, he declined to hold as a matter of law defendants could not have acted in good faith, and permitted the

jury to decide that question. As to the denial of due process, he concluded that the state of the law prevented reasonable belief in the lawfulness of such denial, and took the issue from the jury.

■ Defendants failed to propose an instruction covering the state of the law on practices which have been recognized to be or not to be cruel and unusual punishment. They are foreclosed to that extent from challenging the lack of further explanation.

They objected to the court's failure to include the following paragraph:

"You are instructed that until today, the regulation upon which defendants relied had not been held to be unconstitutional. If you find the defendants' acts were reasonable in light of the existing regulations, then you must find that the defendants acted in good faith."

Nowhere does it appear on what regulation defendants relied. If it was the portion of the Department manual which countenanced the use of isolation, defendants virtually conceded they violated the portion of the manual which limited a period of isolation to "relatively short duration." Omission of the quoted paragraph was not error.

Another instruction requested, but not given explicitly, was phrased in terms of immunity. A portion of it said:

"Before the corrections officials in this case can be denied the above instructed immunity, they must have: (1) violated a clearly established constitutional right; (2) they knew or should have known of that right; and (3) they knew or should have known that their conduct violated the constitutional norm."

■ In the context of this case, we think that the content of the requested language was adequately reflected in the instruction given, that a defendant's belief that his acts were lawful must be reasonable in order to amount to good faith. There is no question of defendants' knowledge that plaintiffs had a constitutional right to be free from cruel and unusual punishment. The jury was instructed on the appropriate consider-ations in determining whether the treatment of plaintiffs constituted cruel and unusual punishment. Those considerations were relevant to defendants' awareness whether their conduct violated plaintiffs' right as well as the jury's decision of that question. The manual already referred to implied that defendants' use of isolation was excessive. There are no court decisions dealing with closely similar circumstances and holding isolation of juveniles of similar nature and extent to be lawful. We find no error in the choice of language.

V. *The Court's Ruling as a Matter of Law That Defendants Denied Plaintiffs Their Constitutional Right to Present Evidence Other Than Their Own Testimony*

■ Defendants seem to argue that plaintiffs would have been allowed to call witnesses if they had wished to do so, and that the only possible deficiency was lack of notice to them that they could do so. No basis exists for this argument in view of the stipulation that "Girls accused of misconduct ... were not allowed to have their own witnesses at such a hearing (although the committee did sometimes interview other persons involved in the incident)."

Defendants concede that "fair play" calls for the opportunity to present evidence in one's own behalf. They contend, however, that such opportunity is not a constitutional right. We disagree, except for limitations thereon which might be necessary because of prison security, a consideration not involved here. *Wolff v. McDonnell*, 418 U.S. 539, 566, 94 S.Ct. 2963, 2979–2980, 41 L.Ed.2d 935 (1974); *Nelson v. Heyne*, 355 F.Supp. 451 (N.D. Ind. 1974), 491 F.2d 352 (7th Cir. 1974).

VI. *The Court's Ruling as a Matter of Law That Defendants Did Not Act in Good Faith in Denying Accused Persons the Right to Call Witnesses*

■ Judge Doyle said:

"[A]nd as to good faith defense, I would be prepared to hold as a matter of law on the objective branch that each of the

three should have known that the law required this opportunity to present evidence in defense, and . . . that there would be no need to present any question to the jury since the defendant must carry the case both on the subjective and the objective branch of the test, and I would be deciding the objective test adversely. . . ."

Carrying out the view just quoted, Judge Doyle did not submit to the jury the issue of good faith in denying the right to call witnesses.

The right of an adult prisoner to call witnesses in a disciplinary proceeding involving loss of good time had been established by the Supreme Court in 1974. *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). The right to present evidence had been accorded to a juvenile in 1972, *Nelson v. Heyne*, 355 F.Supp. 451, 457 (N.D.Ind.1972), aff'd 491 F.2d 352 (7th Cir. 1974). We agree with Judge Doyle that by 1977 persons in defendants' positions could no longer be accorded a defense based on a good faith belief that such right did not exist. *See Wood v. Strickland*, 420 U.S. 308, 321, 95 S.Ct. 992, 1000, 43 L.Ed.2d 214 (1974).

*VII. Whether Defendant Batterman Enjoyed Absolute (Judicial) Immunity*

█ Ms. Batterman was chairman of the Disciplinary Committee which decided to confine Crystal. Because of the denial of the right to call witnesses, and because of the court's ruling as a matter of law that defendants could not have acted in good faith in that denial, defendant Batterman was found liable to Crystal, though only for $1.00.

The parties appear to agree that the test is whether her role is "functionally comparable" to that of a judge. *Butz v. Economou*, 438 U.S. 478, 513, 98 S.Ct. 2894, 2914, 57 L.Ed.2d 895 (1978). The Disciplinary Committee was formed of correctional staff members, in rotation, with the proviso that one who had brought the particular charge should not serve. We think this function of imposing discipline more similar to that of

the school board members in *Wood v. Strickland*, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975) than to that of a judge. We note, in addition, that the predicate for liability here is the denial of an established constitutional procedural right rather than a decision of an adjudicatory nature.

*VIII. The Evidentiary Basis for the Award of Damages to Crystal*

█ Defendants assert that there is no support for the award. They say that her testimony does not show the infliction of emotional distress, and challenge the expert medical opinion as based on facts not in evidence.

The first branch of the argument is hard to understand. Crystal testified that she was upset, scared, and "paranoid." She cried, threw her bed around, kicked, ripped up her towel, was going to kill herself, and felt she had no purpose for living. She got hysterical and hid under the bed. They took the bed away. She stopped eating. She counted 436 bricks in the walls. Defendant Ramsden observed her when he thought she was not in control, and too upset to communicate. At one point in the trial, defense counsel told the court he was not making objections because Crystal's emotional state was quite fragile.

It is true that the plaintiff's doctors, in connection with their conclusions about emotional harm recited sensations Crystal had described to them, some of which were reflected in her testimony, and some not. Our review of the record satisfies us that there was little or no prejudicial effect, and that defense counsel must share some of the responsibility for any lack of neatness in the correlation between evidentiary facts and facts on which the expert opinions were based.

A defense expert conceded that Crystal's stay in the security room could have intensified her emotional problems, and that he would have recommended treatment other than isolation because of concern for its effect.

## IX. Mary's Diary as Evidence

Mary kept a diary while in isolation, and it was admitted in evidence. She pointed out and explained certain erasures and changes. The court cautioned the jury to consider what she had said about the preparation of the notes, the changes, and other circumstances she mentioned.

Defendants accord much significance to the changes referred to. Our view is that the court did not abuse its discretion in handling the matter.

## X. Attorney's Fee

Plaintiffs have appealed from the allowance of plaintiffs' attorney's fee, claiming that the amount ($20,125.77) is too small. They also appeal from an allowance in favor of defendants Carballo and Basinas ($1,546.28).

### A. Amount Awarded Plaintiffs

Plaintiffs were represented at one time or another by six lawyers, four of whom were employed on salary by Youth Policy and Law Center, Inc., an entity financed by government and private contributions. Judge Doyle first determined a reasonable hourly rate for each of the six lawyers, varying with their experience and qualifications, but reduced those rates by 40% as to the four Center employees "because of the absence of overhead expenses comparable to those borne by lawyers in private practice." Then, after considering both the significant effect which the result of the lawsuit could have on correctional practices, and the "modest" amounts recovered, he further reduced the compensation of all six by 40% "to bring the total compensation allowed into more reasonable relationship with the monetary recovery in the case."

We think the second type of reduction is clearly within the range of discretion always a part of the judicial determination of a reasonable attorney's fee.

We reach a different conclusion, however, as to the 40% reduction applied to the hourly rates for the four attorneys employed by the Center.

In that connection, Judge Doyle wrote:

"[The attorneys] were employed on a salary basis by Youth Policy and Law Center, Inc., the activities of which are financed largely by governmental funds and in part by contributions from other sources. Any fees awarded by this court would not be received by them individually and, this being true, none of them would be required to apply any portion of the fees to the salaries of secretarial or clerical personnel, rent, utilities, or taxes. Rather, any fees awarded by this court for their services would be paid to the Center; how the receipt of these funds by the Center would affect the other sources of its income is unknown to the court.... The promotion of the welfare of youth is a major objective of the Center and the means employed include lawsuits such as the present action, as well as legislative activities and other efforts.

.   .   .   .   .

"I conclude that the hourly rates which I have found to be reasonable for [the attorneys employed by the Center] should be reduced by 40% because of the absence of overhead expenses comparable to those borne by lawyers in private practice."

In colloquy on the subject one of the lawyers indicated that the Center has some overhead costs, though minimal because of lack of library, for example. Defendants' counsel did not dwell on the amount of overhead, but rather on the proposition that any allowance received would probably be grant income which would have to be turned back to the supporting government agency or offset against future grants. Except for the general terms indicated, there was no basis for comparing the amount of overhead experienced by the Center with the amount experienced by private practitioners, and we do not construe the court's remarks as based on the amount of overhead but rather on the fact that the overhead expense is borne by the government and other contributors. In this respect we see no distinction between overhead and compensation paid to the lawyers

as salary. In any event we think this type of reduction of the amount allowed below the reasonable value of the services performed is inconsistent with the intent of Congress in enacting The Civil Rights Attorney's Fees Awards Act of 1976, amending 42 U.S.C. § 1988.

Although the Act speaks only of "a reasonable attorney's fee," the legislative history provides persuasive material for interpretation. Thus, "a prevailing party is entitled to counsel fees even if represented by an organization or if the party is itself an organization." House Report No. 94–1558 at p. 8, n.16, *citing Torres v. Sachs*, 69 F.R.D. 343 (S.D.N.Y.1975), *aff'd* 538 F.2d 10 (2nd Cir. 1976). In *Torres*, arising under the Voting Rights Act of 1965, the Second Circuit "agree[d] with the courts which have held that the 'allowable fees and expenses may not be reduced because [the prevailing party's] attorney was employed ... by a civil rights organization ... or because the attorney does not exact a fee.' " 538 F.2d at 13.

Similarly Senate Report No. 94–1011, p. 4, n.3, U.S.Code Cong. & Admin.News 1976, p. 5908, leads us to *Brandenburger v. Thompson*, 494 F.2d 885 (9th Cir. 1974). The Ninth Circuit said: "It is true that the prospect of attorneys' fees does not discourage the litigant from bringing suit when the legal representation is provided without charge. But the entity providing the free legal services will be so discouraged, and an award of attorneys' fees encourages it to bring public minded suits when so requested by litigants who are unable to pay. Thus, an award of attorneys' fees to the organization providing free legal services indirectly serves the same purpose as an award directly to a fee paying litigant." 494 F.2d at 889.

The Second Circuit applied its *Torres* decision to an allowance under § 1988 in *Beazer v. New York City Transit Authority*, 558 F.2d 97, 100 (2nd Cir. 1977). The First Circuit has observed that "Attorney's fees are, of course, to be awarded to attorneys employed by a public interest firm or organization on the same basis as to a private

practitioner." *Reynolds v. Coomey*, 567 F.2d 1166 (1978). *See also NAACP v. Bell*, 448 F.Supp. 1164 (D.C.1978); *Card v. Dempsey*, 445 F.Supp. 942 (E.D.Mich.1978); *Willett v. Chester Water Authority*, 447 F.Supp. 967 (E.D.Pa.1978); *Kulkarni v. Nyquist*, 446 F.Supp. 1274 (N.D.N.Y.1977); *Keyes v. School Dist. No. 1, Denver, Col.*, 439 F.Supp. 393 (D.Col.1977).

On remand, the district court is to recompute the allowance so as to eliminate the 40% reduction in the rates for the Center attorneys on account of overhead, and to apply to the new figures the other reduction, on account of the amount of damages.

### B. Award to Defendants Carballo and Basinas

In deciding to allow an attorney's fee with respect to these two prevailing defendants, Judge Doyle observed:

"Defendants Carballo and Basinas left office prior to June 28, 1977 [a month after this action was begun]. The original complaint described the policies, practices, actions and omissions complained of and alleged that they had been promulgated and performed by defendant Carballo. It sought money damages from him. The amended complaint expanded upon the description of the policies, practices, actions and omissions complained of, attributed them to defendants Carballo and Basinas among others. It sought money damages from defendant Carballo and defendant Basinas. At the close of the plaintiffs' case in the jury trial in this action, no evidence had been offered to show that either defendant Carballo or defendant Basinas had been personally involved in any of the conduct complained of.

"It was reasonable for the plaintiffs to join Carballo and Basinas in this action with respect to the prayer for injunctive and declaratory relief. It was not unreasonable for the plaintiffs to refrain from seeking a prompt substitution of their successors in office as defendants for purposes of injunctive and declaratory relief. In the light of the absence of evidence at

trial, it was unreasonable for the plaintiffs to join Carballo and Basinas as defendants with respect to money damages, and as the case progressed it was unreasonable for the plaintiffs to refrain from voluntarily dismissing the action against them as to monetary relief."

In colloquy on the subject, the court had adverted to the provision of Rule 11 of the Rules of Civil Procedure making an attorney's signature to a pleading a certification that there is good ground to support it and to the clarity that one could not rely on *respondeat superior* and that the operating head of a huge government department, like Carballo, is "just simply not vulnerable to damages without some showing of personal involvement."

The standard for assessing a defendant's attorney's fees against a plaintiff is whether "a court finds that his claim was frivolous, unreasonable, or groundless, or that the plaintiff continued to litigate after it clearly became so." *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 422, 98 S.Ct. 694, 700–701, 54 L.Ed.2d 648 (1978). In our view it was not clearly erroneous nor an abuse of discretion to find the claim for damages against these two defendants unreasonable.

Judge Doyle reduced the reasonable rate by 40% because defendants' attorney is an Assistant Attorney General not obliged to bear the overhead expenses of that office. Defendants did not appeal. Under the circumstances we see no need to consider the plaintiffs' arguments that the amount allowed was not properly determined.

The order allowing an attorney's fee on behalf of plaintiffs is reversed and that matter is remanded for further proceedings consistent with this opinion.

In all other respects the judgment and order appealed from are affirmed. Plaintiffs are allowed $2,500 payable to Youth Policy and Law Center, Inc., as attorney's fees on appeal, and are allowed two-thirds of their other taxable costs of appeal.