786 F.2d 1080
 H.C., by his next friend and attorney, Carol HEWETT,
individually and on behalf of all others similarly
situated, Plaintiffs,
and
Raymond Ogletree*, individually, Plaintiff-Appellant,
v.
Dee JARRARD, in her capacity as Direct Services Supervisor
of the Fla. Dept. of Health & Rehabilitative
Services, et al., Defendants-Appellees.
 No. 83-3676.
 United States Court of Appeals,
Eleventh Circuit.
 April 15, 1986.
 
 Jonathan Hewett, Lexington, Ky., C. James Dulfer, Cent. Fla. Legal Services, Inc., Daytona Beach, Fla., for plaintiff-appellant.
 Claire Dryfuss, Asst. Gen. Counsel, Fla. Dept. of Health & Rehab. Services, Harden King, Tallahassee, Fla., for defendants-appellees.
 Appeal from the United States District Court for the Northern District of Florida.
 Before KRAVITCH and CLARK, Circuit Judges, and PECK**, Senior Circuit Judge.
 KRAVITCH, Circuit Judge:
 
 
 1
 Juvenile detainees brought a class action, pursuant to 42 U.S.C. section 1983, challenging the conditions and practices at the Volusia Regional Juvenile Detention Center (Center) operated by the Florida Department of Health and Rehabilitative Services (HRS). After extensive hearings, the district court entered sweeping injunctive relief designed to bring the Center up to constitutional standards. Raymond Ogletree had been incarcerated at the Center and was permitted to intervene in the class action to pursue individual damage claims. This appeal concerns only Ogletree's individual claims. The district court awarded nominal damages on Ogletree's claims that the imposition of extended isolation without notice and hearing and the conditions of that isolation violated the due process clause of the fourteenth amendment. The district court further concluded that the named defendants had not deliberately deprived Ogletree of medical attention and that defendant Wade's battery of Ogletree did not rise to a constitutional violation.
 
 
 2
 Ogletree appeals the award of only nominal damages on his first two claims and the district court's conclusions that he suffered no constitutional deprivation when he was assaulted by a superintendent at the Center and that the named defendants had not denied him medical attention. We conclude that Ogletree was entitled to more than nominal damages on his first two claims and remand to the district court to determine proper compensatory and punitive damages. Moreover, the district court's conclusions that Wade's assault and subsequent denial of medical attention did not violate Ogletree's constitutional rights are incorrect. Accordingly, we reverse the judgment for defendants on these latter claims and remand for a determination of damages.
 
 I. BACKGROUND
 
 3
 The majority of youths confined at the Volusia Center await trial on delinquency charges. The Center also houses children who have been adjudicated delinquent but either have not had disposition hearings or are awaiting placement in a treatment facility.
 
 
 4
 The district court's findings and our review of the record reveal the following facts.
 
 
 5
 Ogletree, then sixteen years old, was confined to the Center from April 14, 1979 through May 10, 1979, and again from July 24, 1979 through September 10, 1979, pending trial on delinquency charges. Throughout Ogletree's incarceration, defendant-appellee, Richard Wade, was the superintendent of the Center.[1] On April 25, 1979, Ogletree laughed when another detainee attempted to flush a pair of undershorts down a toilet. Wade arrived on the scene after the first detainee had been removed and taken to isolation. Ogletree continued laughing and protesting the imposition of isolation on the first detainee. Ogletree testified that Wade then slammed him against a wall and informed him that he too would be placed in isolation. Wade and three staff members then took him to isolation. Ogletree testified that, once inside the cell, his shoulder was injured when Wade shoved him against the wall and a metal cot in the cell. Ogletree remained isolated for seven consecutive days as a result of this incident.[2] He was not provided written notice of the charges against him nor given an opportunity to defend himself before an impartial person or to call witnesses in his behalf. Ogletree testified at trial that he never knew how long his isolation would last; his affidavit indicates that he was merely told that he would remain in isolation until Wade decided to release him. His demands for medical attention for his injured shoulder were ignored until the third day of isolation when he was transported to the emergency room of a local hospital. There, his wound was cleaned and he was injected with a muscle relaxant for pain. No further medical treatment was needed and Ogletree did not suffer permanent physical scarring.
 
 
 6
 Ogletree's seven day isolation took place in a small concrete cell with a solid door. The room had no furnishings except a metal bunk and toilet. Ogletree was stripped to his underwear and was not allowed visitors. He took his meals in the cell, but was released to shower at about 10 p.m. every other evening. He was not permitted any reading or writing materials or any other means to occupy himself, nor was he permitted outdoor exercise. He could not flush his own toilet because the controls were outside the cell. He had to bang on the door of his cell to capture the attention of workers who might not flush his toilet until several hours later.
 
 
 7
 Once when Ogletree banged on the cell door, the staff informed him that they were tired of his banging. Four staff members entered his cell and shackled his legs with metal cuffs to one end of his bunk. His wrists were handcuffed over his head to the other end of the bunk.[3] Ogletree testified that he remained restrained in this fashion for "several hours" and was not told when he would be unshackled. He also testified as to the mental anguish caused by both the isolation and the shackling.
 
 
 8
 Defendants did not controvert Ogletree's testimony. Wade testified that spring, 1979, was a very tense time due to crowded conditions and difficult youths at the Center. Wade claimed that Ogletree had a reputation for being an unmanageable troublemaker who regularly engaged in altercations with others. Wade further testified that Ogletree was isolated for more than six hours[4] because of an emergency situation prompted by a rumor that a gun had been secreted in the Center and by an incident in which a detainee had obtained the Center's master keys. On cross-examination it became apparent that Ogletree was isolated the day before the gun rumor circulated and several days after the keys incident with which Ogletree was not involved.
 
 
 9
 Ogletree introduced into evidence five incident reports which were the sum total of reports concerning him. There was no indication from these reports that Ogletree ever harmed or threatened to harm another detainee or Center employee or that he ever damaged property. One report reveals an instance of the use of profanity; another relates that Ogletree once was caught sneaking books into his cell because, according to the report's author, he was bored. A detention evaluation reflects that Ogletree generally participated in activities and followed rules and notes that Ogletree's biggest problem was his habit of "mouthing off."
 
 II. OGLETREE'S CLAIMS ON APPEAL
 
 10
 Ogletree appeals the district court's determination that Wade's battery and subsequent denial of medical attention were not constitutional violations. The district court also concluded, however, that the denial of notice and hearing regarding the imposition of isolation as well as the length and conditions of the solitary confinement violated Ogletree's due process rights. Naturally, Ogletree does not appeal these latter conclusions; he merely contends that the court erred in awarding only nominal damages on these claims. We address this latter contention in part III, infra.
 
 A. The Battery
 
 11
 The district court, relying on Ingraham v. Wright, 430 U.S. 651, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977), found that Wade's shoving of Ogletree did not rise to the level of a constitutional violation. We disagree. In Ingraham, the Court concluded that the fourteenth amendment, rather than the eighth amendment, provided the appropriate framework for assessing the constitutional ramifications of corporal punishment administered by public school teachers. 430 U.S. at 670-71, 97 S.Ct. at 1412. The Ingraham Court held that "corporal punishment in public schools implicates a constitutionally protected liberty interest, but ... traditional common-law remedies are fully adequate to afford due process." Id. at 672, 97 S.Ct. at 1413. Essential to the Ingraham analysis is that reasonable corporal punishment inflicted by teachers is lawful but excessive punishment is actionable. The Ingraham majority concluded that the procedural safeguards of notice and hearing were not required before teachers imposed corporal punishment because this punishment was "authorized and limited by the common law." 430 U.S. at 682, 97 S.Ct. at 1418.
 
 
 12
 The situation here is different. Initially we must decide whether the Volusia Center is closer to a public school (controlled by Ingraham ) or a prison (controlled by constitutional standards pertinent to detainees and convicts). The question is not difficult; the Center is for juveniles who have run afoul of the law. Regardless of one's view of corporal punishment in the schoolhouse, it is routinely permitted in numerous states. Ingraham, 430 U.S. at 662-63 & nn. 23 & 28, 97 S.Ct. at 1407-08 & nn. 23 & 28. Indeed, as of 1977 only two states flatly prohibited this practice, id. at 663 & n. 27, 97 S.Ct. at 1408 & n. 27. Routine corporal punishment in schools was so thoroughly regulated by the common law and state statutes, that the Court declined to consider what instances of scholastic corporal punishment would give rise to a substantive due process violation. Id. at 659, 679 nn. 12 & 47, 97 S.Ct. at 1406, 1416 nn. 12 & 47. Here, however, no state authorizes the routine corporal punishment of detainees. Indeed, the due process clause forbids punishment of pretrial detainees. Schall v. Martin, 467 U.S. 253, 104 S.Ct. 2403, 2412, 81 L.Ed.2d 207 (1984) (juveniles detained to await trial may not be punished); Bell v. Wolfish, 441 U.S. 520, 535 & n. 16, 99 S.Ct. 1861, 1872 & n. 16, 60 L.Ed.2d 447 (1979); Jones v. Diamond, 636 F.2d 1364, 1368 (5th Cir.) (en banc), cert. dismissed, 453 U.S. 950, 102 S.Ct. 27, 69 L.Ed.2d 1033 (1981).[5] Akin to the interests of school children to be free of excessive corporal punishment, the conditions of detainee incarceration affect liberty interests protected by the fourteenth amendment rather than the eighth, see Hamm v. DeKalb County, 774 F.2d 1567, 1572-74 (11th Cir.1985), cert. denied, --- U.S. ----, 106 S.Ct. 1492, 89 L.Ed.2d 894 (1986). This, however, is where the similarity between this case and Ingraham ends.
 
 
 13
 We are mindful of Judge Friendly's admonition that "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights." Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir.), cert. denied, 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973). Judge Friendly observed that although the eighth amendment did not apply to detainees, "it would be absurd to hold that a pre-trial detainee has less constitutional protection against acts of prison guards than one who has been convicted." Id. at 1032. This observation is the law in this circuit. See Hamm v. DeKalb County, 774 F.2d at 1573-74 ("states may not impose on pretrial detainees conditions that would violate a convicted prisoner's eighth amendment rights").
 
 
 14
 In Shillingford v. Holmes, 634 F.2d 263, 265 (5th Cir.1981), the former Fifth Circuit adopted an analytic framework, akin to Johnson 's, to determine when use of force by a state officer rises to a constitutional deprivation. In assessing Wade's conduct we look to "the need for the application of force, the relationship between the need and the amount of force that was used, the extent of injury inflicted, and whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." Johnson, 481 F.2d at 1033 (quoted in Gilmere v. City of Atlanta, 774 F.2d 1495, 1500-01 (11th Cir.1985) (en banc)).
 
 
 15
 Several facts indicate that Wade crossed the bounds of constitutional behavior. It is uncontroverted that when Wade first shoved Ogletree against a wall, Ogletree was merely giggling at the prank of another detainee and protesting the imposition of isolation on that detainee.[6] There is no indication whatsoever that Ogletree threatened to harm any property, employees or other detainees at the Center when Wade shoved him initially or when Wade slammed him against the wall and metal bunk of the isolation cell. Moreover, the rumor that a gun had been hidden at the Center was exposed on cross examination as not temporally related to the battery of Ogletree. Based upon the uncontroverted evidence, there was no need for Wade to apply force to Ogletree. Specifically, there was no need to shove Ogletree against a wall in the isolation cell or to confine him in the isolation cell to stop him from laughing at another detainee's actions. Accordingly, the balance of the first two Johnson factors weighs in Ogletree's favor.
 
 
 16
 The balance of the remaining Johnson factors also favors Ogletree. Although Ogletree suffered no permanent physical scarring, his injuries did require medical treatment. Because we are assessing the injuries of a juvenile suffered at the hands of an adult jailor, we will not dismiss Ogletree's injuries as negligible solely because by fortuitous circumstance Ogletree did not suffer broken bones and permanent disfigurement. See note 10 infra; cf. Shillingford, 634 F.2d at 266 (that compensable unprovoked attack was not crippling was merely fortuitous).
 
 
 17
 Whether Wade acted in good faith to maintain discipline or to sadistically harm Ogletree is a more difficult question. Courts rarely assess the motives of correctional officers and discover intentions of pure good or evil. In light of the needless imposition of force, the subsequent shackling and denial of medical care, and the district court's conclusion that length and conditions of isolation "amounted to punishment in violation of the due process clause," we conclude that Wade's shoving of Ogletree was one of a series of acts intended to punish Ogletree rather than maintain discipline. We conclude, therefore, that Wade's battery of Ogletree amounted to a constitutional violation.
 
 B. Denial of Medical Care
 
 18
 In Estelle v. Gamble, 429 U.S. 97, 106, 97 S.Ct. 285, 292, 50 L.Ed.2d 251 (1976), the Court held that the eighth amendment is violated by deliberate state indifference to a prisoner's serious medical needs. Following City of Revere v. Massachusetts General Hospital, 463 U.S. 239, 244, 103 S.Ct. 2979, 2983, 77 L.Ed.2d 605 (1983), we recently held that detainees must be afforded the same minimum standard of medical care due convicted inmates. Hamm v. Dekalb County, supra. We agree with the district court's determination that a three day refusal to provide medical attention was a "reckless disregard" of Ogletree's medical needs. In Ancata v. Prison Health Services, Inc., 769 F.2d 700, 704 (11th Cir.1985), we held that the failure to provide diagnostic care and medical treatment known to be necessary was deliberate indifference. We further noted that delay of necessary treatment for non-medical reasons also established deliberate indifference sufficient to establish a constitutional violation. Id.
 
 
 19
 The district court, however, held that the named defendants were not responsible for denying Ogletree medical care. We disagree. It is axiomatic, in section 1983 actions, that liability must be based on something more than a theory of respondeat superior. Monell v. Department of Social Services, 436 U.S. 658, 691, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1979). The new Fifth Circuit, relying on precedent binding on this court, recently addressed supervisory liability for the denial of medical care to a prison inmate.[7] In Barksdale v. King, 699 F.2d 744 (5th Cir.1983), the court concluded that liability may be shown by either the supervisor's personal participation in the acts that comprise the constitutional violation or the existence of a causal connection linking the supervisor's actions and the violation. The Barksdale court further concluded that violation of a duty imposed by state law resulting in constitutional injury will establish a causal connection sufficient to trigger supervisory liability. Id. at 746 (citing Reimer v. Smith, 663 F.2d 1316, 1322 n. 4 (5th Cir.1981) (new Fifth Circuit); Douthit v. Jones, 641 F.2d 345, 346 (5th Cir.1981) (on rehearing); Henzel v. Gerstein, 608 F.2d 654, 658 (5th Cir.1979); Sims v. Adams, 537 F.2d 829, 831 (5th Cir.1976)).
 
 
 20
 Our review of the record and the district court's findings convince us that Ogletree did indeed sue those who were responsible for denying him medical care. Wade was responsible both personally and in his capacity as the Center's superintendent. Wade personally inflicted the injury to Ogletree's shoulder when he threw Ogletree against the wall and metal bunk in the isolation cell. Although section 1983 redresses only torts of constitutional dimension, section 1983 defendants are, as in common law tort suits, nonetheless responsible for the natural consequences of their actions. Monroe v. Pape, 365 U.S. 167, 187, 81 S.Ct. 473, 484, 5 L.Ed.2d 492 (1961), overruled in part on other grounds, Monell, 436 U.S. at 663, 98 S.Ct. at 2021-22. Wade's participation in Ogletree's injury and subsequent denial of Ogletree's immediate pleas for medical attention satisfy the first alternative of the Barksdale supervisory liability analysis. Wade's authorization and imposition of isolation for a period well beyond the Florida HRS guidelines effectively placed medical attention beyond Ogletree's reach and provides a causal connection implicating him in his supervisory capacity.[8] Ogletree's isolation delayed his medical attention by three days in that the only way he could communicate his need for a doctor was by banging on his cell door--a procedure that the Center personnel could respond to by shackling him to his bunk. Thus by placing an injured detainee in isolation, Wade, in his capacity as a supervisor, delayed medical treatment for punitive, non-medical reasons. See Ancata, supra.
 
 III. DAMAGES
 
 21
 The district court awarded nominal damages of one dollar against Wade to compensate Ogletree for the imposition of isolation without procedural due process and the imposition of isolation for a period beyond the maximum period set out in the HRS regulations.[9] For the reasons set out below we conclude that Ogletree was entitled to compensatory and punitive damage awards for these deprivations. On remand the district court also will have to determine the proper amount of damages for Wade's battery and denial of medical care.
 
 A. Compensatory Damages
 
 22
 In Carey v. Piphus, 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978) the Court addressed the prerequisites for recovery under section 1983 for a denial of procedural due process. Carey held that "although mental and emotional distress caused by the denial of procedural due process itself is compensable under Sec. 1983, ... neither the likelihood of such injury nor the difficulty of proving it is so great as to justify awarding compensatory damages without proof that such injury actually was caused." Id. at 264, 98 S.Ct. at 1052. Carey further held that, absent actual injury, deprivation of a due process right is actionable for nominal damages. Id. at 266-67, 98 S.Ct. at 1053-54.
 
 
 23
 Our review of the record convinces us that "real injury can be inferred from the facts." Baskin v. Parker, 602 F.2d at 1205, 1210 (5th Cir.1979). Ogletree's claims are akin to the claims in King v. Higgins, 702 F.2d 18 (1st Cir.), cert. denied, 464 U.S. 965, 104 S.Ct. 404, 78 L.Ed.2d 344 (1983). There, a prisoner established that he served fifteen days in solitary confinement that would not have been imposed had he been afforded procedural due process. The King court affirmed a determination that the prisoner was entitled to $375 for the pain and suffering of spending fifteen days in solitary confinement. Id. at 19-20. The district court's findings in this case and our review of the evidence convince us that the imposition of solitary confinement on Ogletree was wholly unjustified. Thus Ogletree is in the same position as the King petitioner: his isolation "can ... reasonably be attributed to the deprivation of due process." Id. at 22. Compensatory damages are appropriate where juveniles have wrongfully received solitary confinement. Mary and Crystal v. Ramsden, 635 F.2d 590, 593, 600-01 (7th Cir.1980).
 
 
 24
 Compensation for wrongful incarceration in isolation must also redress Ogletree's emotional damages. Emotional injury is actionable under section 1983 for humiliation, embarrassment, and mental distress resulting from the deprivation of a constitutional right. Baskin v. Parker, 602 F.2d at 1209-10. See also Barnett v. Housing Authority, 707 F.2d 1571, 1579 (11th Cir.1983) (substantive and procedural due process violations can give rise to damages for mental harm). Here, Ogletree testified about his humiliation and dejection. See Mary and Crystal v. Ramsden, supra. The facts depict a juvenile who was isolated for seven days, shackled and handcuffed to a metal bunk for part of that time and deprived of virtually every physical or emotional stimulus. Real injury may be inferred from the conditions and length of adult confinement, see, e.g., Furtado v. Bishop, 604 F.2d 80, 90 (1st Cir.1979), cert. denied, 444 U.S. 1035, 100 S.Ct. 710, 62 L.Ed.2d 672 (1980). Juveniles are even more susceptible to mental anguish than adult convicts. See Schall v. Martin, 104 S.Ct. 2403, 2411 & n. 15 (1984).[10] We hold that the uncontroverted facts of this case establish actual injury and therefore the district court erred by limiting its award to nominal damages.
 
 
 25
 We do not determine the amount of damages Ogletree should receive. Many courts considering awards for wrongful imposition of isolation provide a lump sum, see Furtado, 604 F.2d at 89 (compute damages via comparison of conditions in general population with conditions in isolation); cf. United States ex rel. Larkins v. Oswald, 510 F.2d 583, 589-90 (2d Cir.1975) (affirming jury award of $1,000 for wrongfully imposed isolation that also lasted five days longer than prison regulations permitted), whereas other courts compute an award on a per diem basis. See Sostre v. McGinnis, 442 F.2d 178, 205 n. 52 (2d Cir.1971) (en banc) (award of $25 per day for wrongful prison segregation not unreasonable), cert. denied, 405 U.S. 978, 92 S.Ct. 1190, 31 L.Ed.2d 254 (1972); Pino v. Dalshiem, 605 F.Supp. 1305 (S.D.N.Y.1984); O'Connor v. Keller, 510 F.Supp. 1359, 1375 (D.Md.1981) (award of $100 per day for wrongful isolation). We do not adopt a specific formula for the calculation of actual injury. Instead, we remand this case to the district court to determine the proper amount of compensatory damages.
 
 B. Punitive Damages
 
 26
 The district court found that Wade's conduct "was not so egregious nor did it exhibit maliciousness or ill will so as to warrant punitive damages." We conclude that this finding is erroneous.
 
 
 27
 In Smith v. Wade, 461 U.S. 30, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983), the Court addressed the standards for punitive damages in section 1983 actions. Punitive damages are appropriate where a defendant's conduct is motivated by evil intent or involves callous or reckless indifference to federally protected rights. Id. at 56, 103 S.Ct. at 1640. In denying Wade official immunity, under Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982), the district court necessarily determined that Wade "violate[d] clearly established statutory or constitutional rights of which a reasonable person would have known." We conclude that a reasonable person would know that the Constitution forbids the use of unnecessary force on a juvenile detainee, the denial of medical attention, and the shackling of a nonviolent juvenile to a bed in an isolation cell. We further conclude that no reasonable person could believe that a juvenile detainee may be placed indefinitely in isolation and the "key thrown away," i.e.--no notice of charges or hearing provided the detainee.[11] In sum, we conclude that Wade's actions transcended mere negligence and constituted callous indifference to Ogletree's federally guaranteed rights and remand for the district court to determine an appropriate amount of punitive damages.
 
 IV. CONCLUSION
 
 28
 We AFFIRM the district court's order insofar as it determined that the imposition and conditions of isolation violated due process. We REVERSE the order insofar as it absolved defendant Wade from liability for the denial of medical attention and determined that Wade's battery did not amount to a constitutional violation. We further REVERSE the lower court's order insofar as it limited Ogletree's award to nominal damages. We conclude that the facts establish actual compensable injury and conduct sufficiently egregious to warrant punitive damages. We REMAND so that the district court may determine the proper amounts of actual and punitive damages and enter judgment accordingly.[12]
 
 
 
 *
 Ogletree was referred to as R.O. in the district court's order because he was a minor when he intervened in this action. No longer a minor, Ogletree fully disclosed his identity in his appellate proceedings. We conclude, therefore, that he has waived anonymity
 
 
 **
 Honorable John W. Peck, Senior U.S. Circuit Judge for the Sixth Circuit, sitting by designation
 
 
 [1]
 The other defendants-appellees in this case are: Dee Jarrard, a direct services supervisor whose responsibilities included supervision over HRS's intake functions in Volusia County, Florida, Vincent McClintock, a district administrator for HRS who had direct supervisory responsibility over superintendent Wade and, David Pingree, the Secretary of HRS, the agency responsible for the operation of juvenile detention centers in Florida. Ogletree essentially challenges the conduct of Wade; the three other defendants are liable to Ogletree in their supervisory capacities to the extent that they either set or condoned the policies that deprived Ogletree of his constitutional due
 This court declined to hear appellees' oral argument because they failed to file a brief.
 
 
 [2]
 Ogletree testified that he was isolated for eight days; defendants suggested that the isolation lasted six days. The district court found, however, that the isolation lasted seven days
 
 
 [3]
 Although the district court found that both of Ogletree's wrists and ankles were shackled to the bed, Ogletree's testimony suggests that only one wrist and one ankle were shackled. This does not render the incident less shocking, but explains how Ogletree slid the mattress off his bunk while yelling, kicking and "trying to pop [his] leg and arm off." Ogletree, direct testimony at 24-25
 
 
 [4]
 HRS regulations set a six hour maximum for time in isolation. Defendants contended that Wade relied in good faith on proposed regulations that were never enacted. The proposed regulations provided in relevant part:
 (5) No child shall be confined for isolation purposes for a continuous time period exceeding six hours, excluding the regular sleeping period, without the written justification and authorization of the superintendent. The superintendent, as a basis for authorizing continued isolation beyond six (6) hours, shall personally discuss the incident or incidents with all involved children and staff and shall review all pertinent written reports.
 (6) Isolation shall be used only when a child is beyond the control of the staff.
 Defendants Proposed Findings of Fact and Conclusions of Law at 15. There is no indication, however, that Wade followed the proposed regulations. Ogletree was immediately placed in isolation after laughing at another detainee's actions. Wade never discussed with Ogletree the reasons why isolation was imposed or how long it would last.
 
 
 [5]
 The Eleventh Circuit, in the en banc decision Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir.1981), adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981
 We do not suggest that a pretrial detainee may never be disciplined. "Not every disability imposed during pretrial detention amounts to 'punishment' in the constitutional sense.... Bell, 441 U.S. at 537, 99 S.Ct. at 1872. In Kennedy v. Mendoza-Martinez, 372 U.S. 144, 168-69, 83 S.Ct. 554, 567-68, 9 L.Ed.2d 644 (1963), the Court set out factors to determine when "restrictions and conditions accompanying pretrial detention amount to punishment in the constitutional sense...." Bell, 441 U.S. at 538, 99 S.Ct. at 1873.
 
 
 [6]
 As in Shillingford, where the plaintiff was photographing an arrest when assaulted, 634 F.2d at 264, Ogletree was a mere bystander. We reaffirm the principles of Shillingford: state officers may not blindly lash out at bystanders regardless of whether the context is a public street or a juvenile detention center
 
 
 [7]
 As previously noted, our recent decision in Hamm held that detainees must receive at least the same minimum standards of care as convicted inmates. Implicit in the Hamm holding, therefore, is that detainees may maintain civil rights actions against state institution supervisors under standards similar to those used to analyze the claims of convicted inmates
 
 
 [8]
 Ogletree does not argue, and the district court did not find, that defendants Jarrard, Pingree and McClintock were responsible in their supervisory capacities for Wade's physical abuse of Ogletree and denial of medical care. Although Ogletree's brief states that an issue on appeal is "whether state supervisory personnel are liable for the reckless neglect of a prisoner's medical needs," Ogletree's argument focuses entirely on Wade's supervisory liability for this deprivation. See Appellant's Brief at viii, 7-10. Accordingly, we do not address possible liability of defendants Jarrard, Pingree and McClintock on the battery and medical inattention claims
 The district court found that "[d]efendants ... violated the procedural due process requirements of the fourteenth amendment." H.C. v. Jarrard, No. TCA 79-0830 at 39 (N.D.Fla. Oct. 17, 1983) (Mem. Opinion). The district court also determined that the length and conditions of isolation, as well as the shackling of Ogletree, violated due process and stated that Wade was responsible for the imposition of isolation and shackling of Ogletree. Ogletree does not argue that Jarrard, McClintock or Pingree were responsible for the imposition of isolation or his shackling. Because the district court entered injunctive relief against all defendants regarding isolation conditions and procedures, on remand it may wish to clarify whether it awards damages against Jarrard, McClintock and Pingree in their supervisory capacities for the length and conditions of Ogletree's isolation and denial of procedural due process.
 
 
 [9]
 Although the district court found that "the length of isolation, the shackling while in isolation, and the conditions of isolation amounted to [a constitutional violation]," it premised its award on the finding that "Wade should have known ... some due process should have been afforded [Ogletree]" and that the length of isolation violated HRS regulations. We assume that the district court included the shackling and conditions of isolation in its award of nominal damages
 
 
 [10]
 "Our society recognizes that juveniles in general are in the earlier stage of their emotional growth, that their intellectual development is incomplete, that they have had only limited practical experience, and that their value systems have not yet been clearly identified or firmly adopted...." Martin, supra, quoting with approval, People ex rel. Wayburn v. Schupf, 39 N.Y.2d 682, 385 N.Y.S.2d 518, 520-21, 350 N.E.2d 906, 909-10 (1976). The Martin Court, citing Eddings v. Oklahoma, 455 U.S. 104, 115, 102 S.Ct. 869, 877, 71 L.Ed.2d 1 (1982), noted further that "minority 'is a time and condition of life when a person may be most susceptible to influence and to psychological damage.' " 104 S.Ct. at 2411
 
 
 [11]
 The district court determined that "Wade should have known that at least some due process should have been afforded to [Ogletree]" and that "the length of isolation was in violation of HRS's own regulations." H.C. v. Jarrard, slip op. supra at 40
 Wade's actions specifically violated HRS regulations that proscribe isolation for more than six hours and shackling nondangerous juveniles. Id. at 17, 19. Cf. Dudley v. Stewart, 724 F.2d 1493, 1495 (11th Cir.1984) (convicts do not have due process protections against imposition of solitary confinement absent state created liberty interest). Although Wade contended that he relied in good faith on proposed regulations that provided him with the discretion to impose isolation for more than six hours, the record indicates that he failed to follow even the proposed regulations. See note 4, supra.
 
 
 [12]
 There are four discrete injuries that must be redressed: (1) the imposition of isolation without notice or hearing; (2) the excessive length and conditions of isolation (including shackling); (3) the unjustified and excessive force applied to Ogletree (Wade's battery); and (4) the denial of medical care. As noted above, the district court's award of nominal damages for the first two injuries was inadequate