717 F.2d 1105
 James REDDING, Jamal Ali Akbar a/k/a James I. Benson, Donald
Woodruff, Donald Jones, Paul William Tedder,
Melvin Nalls, and Jeffrey Armstrong,
Plaintiffs- Appellees, Cross-Appellants,
v.
James FAIRMAN, Capt. Wheat, Capt. Hosier, Capt. Shehorn,
Capt. Poe, Capt. Wenzelman, Lt. Martinez, Lt. Foster, Lt.
Delos Santos, Mary Catherine Noonan, Kent Mills, Ferd
Klaren, Larry Livingston, R.K. Hanson, Terry Williams, Hugh
Johnson, Diane Marion, John Kammerman, and Five Unknown
Members of the Institutional Adjustment Committee,
Defendants-Appellants, Cross-Appellees.
 Nos. 82-1472, 82-1541, 82-1892 and 82-1955.
 United States Court of Appeals,
Seventh Circuit.
 Argued May 12, 1983.
Decided Sept. 13, 1983.
Certiorari Denied Feb. 21, 1984.
See 104 S.Ct. 1282.
 
 Thomas A. Ioppolo, Asst. Atty. Gen., Chicago, Ill., for defendants-appellants, cross-appellees.
 J. Steven Beckett, Champaign, Ill., for plaintiffs-appellees, cross-appellants.
 Before BAUER, WOOD, Circuit Judges, and ROSENN, Senior Circuit Judge.*
 BAUER, Circuit Judge.
 
 
 1
 The eighteen defendants, all staff of the Illinois Department of Corrections, appeal from adverse judgments on jury verdicts and an award of attorney's fees and costs entered in consolidated cases filed under 42 U.S.C. Sec. 1983 (1979) and 28 U.S.C. Sec. 1343 (1979). The plaintiffs, all prison inmates, cross-appeal on several issues.
 
 
 2
 Originally, seven prisoners filed eight separate pro se cases challenging the constitutionality of procedures used at the Pontiac Correctional Center to conduct disciplinary hearings for prisoners charged with major misconduct. The district court consolidated the cases and appointed the plaintiffs counsel who filed an amended complaint.[1]
 
 
 3
 After discovery, both sides filed motions for summary judgment. The district court granted the plaintiffs' motion in part, concluding that each of the eighteen prison Adjustment Committee hearings at issue was constitutionally defective because Committee summaries were inadequate. Additionally, the court ruled that three plaintiffs were denied their procedural rights because certain defendants did not disqualify themselves from participating in the hearings.
 
 
 4
 In December 1981, a jury tried the remaining issues, including (1) whether two plaintiffs were improperly denied their right to call witnesses at their hearings, (2) whether Adjustment Committee members acted in good faith, and (3) the extent of any actual injuries to the plaintiffs. The jury awarded a total of $6,020 compensatory damages and $400 punitive damages; these were distributed as explained below. The district court awarded nominal damages to two plaintiffs who received no award from the jury. The court also awarded the plaintiffs $14,995 attorney's fees and $1,437.36 costs.
 
 
 5
 Because the district court applied incorrect constitutional standards to certain issues before it, we affirm in part, reverse in part, and remand for further consideration.
 
 I. FACTS
 A. Administrative Regulation 804
 
 6
 Administrative Regulation (A.R.) 804 defines major prisoner misconduct and establishes procedures and punishments for use when a prisoner is ticketed with a disciplinary violation. Three provisions of A.R. 804 interest us here. The first, section (II)(G)-(4), states: "Under no circumstances may any person who initiated the allegations which serve as the basis for the Resident Disciplinary Report, or who investigated those allegations, or who witnessed the incident sit on the Adjustment Committee hearing that Resident Disciplinary Report." The regulation contains no other provision regarding impartiality of Committee members. The second provision, section (II)(G)-(9), states in part: "Witnesses requested by residents may be excluded [from the hearing] if their testimony would be irrelevant, cumulative, jeopardize the safety of an institution, or disrupt the security of the facility. If any witness is excluded, a written reason will be recorded." The third provision relevant to this case, section (II)(G)-(11), states:
 
 
 7
 The Adjustment Committee shall decide whether or not the resident committed the chargeable offense based upon the evidence it admits at the hearing. As previously stated, the Committee must be reasonably satisfied that the resident committed the offense for him/her to be found guilty of same. All evidence submitted, including all oral and written statements, shall be summarized in the written record prepared by the Committee. The Committee members shall specifically refer to the evidence which convinced them to decide the resident did or did not commit the chargeable offense. A short explanation shall be stated of why information purporting to exonerate the resident was discounted --if the resident was found in violation. It will not be sufficient for the Committee's decision to simply adopt and copy the exact wording of the Resident Disciplinary Report. In addition, the disposition of the hearing, the disciplinary action taken, the duration of a segregation placement, as well as the reasons for the disciplinary action and the length of the segregation placement shall be specified in the written record. The written record must be signed by all the members of the Adjustment Committee. (Emphasis added.)
 
 
 8
 Under A.R. 804, the Adjustment Committee consists of three members appointed by the Chief Administrative Officer of the prison. The Committee chairperson must have the rank of Captain or above. At the hearing, one Committee member records the proceedings, including the inmate's testimony, the disposition, evidence relied on, and the basis for decision. These observations are recorded on a pre-printed form titled Adjustment Committee Summary.
 
 B. Plaintiff Redding
 
 9
 James Redding received a resident disciplinary report on November 19, 1979, charging him, among other things, with forging a name on a medical pass in violation of A.R. 804 Secs. (II)(A)-(1), (13) & (14). On November 21, Redding appeared before the Adjustment Committee, then consisting of Defendants Hosier, Marion, and Klaren. Redding requested that Hosier disqualify himself, because Redding had an unrelated civil rights suit for damages pending against Hosier. Hosier refused the request.
 
 
 10
 The Committee found Redding guilty. In the section of the Adjustment Committee Summary marked "Record of Proceedings," the Committee wrote: "Resident states the officer is lying, that is his signature. And this document is not a forgery." In the section marked "Basis for Decision/Evidence Relied Upon," the Committee wrote: "All evidence presented has convinced the committee the resident is guilty of forging a pass or altering a pass, giving false information to a [sic] employee and disobeying a prison rule." Redding received fifteen days in segregation and a thirty-day demotion to C-grade status, entailing loss of certain privileges accorded to A-grade inmates. The Committee's finding of guilt and the punishment imposed were approved by Defendant Fairman, Pontiac's warden, but six months later the entire incident was expunged from Redding's record because the charging officer admitted that the signature was not a forgery.
 
 
 11
 Redding testified in a deposition that he submitted an advance written request to call three witnesses at the Committee hearing.[2] The Committee denied his requests. The Adjustment Committee Summary did not explain two of the three denials.
 
 
 12
 At trial, Redding testified that he spent fifteen days in segregation as a result of the Committee decision. The jury awarded Redding $20 compensatory damages for denial of Redding's request to call witnesses, denial of an impartial decisionmaker, and inadequate summaries of the evidence and reasons for the Committee decision. The jury awarded Redding $200 punitive damages against Defendant Hosier for refusal to disqualify himself from the Committee.
 
 C. Plaintiff Akbar
 
 13
 A resident disciplinary report dated January 10, 1980, charged Jamal Ali Akbar with possession of gang-related materials--specifically letters or "kites"--in violation of A.R. 804 Secs. (II)(A)-(1), (14) & (15). Akbar was immediately placed in segregation. He made no advance written request for witnesses.
 
 
 14
 Akbar appeared before the Adjustment Committee on January 13. Under "Record of Proceedings," the Committee wrote in part: "Resident states that he was unaware of having the gang-related materials in his possession. States he had just picked up some affidavits from Resident Withers and placed them in a legal folder." In the section "Basis for Decision/Evidence Relied Upon," the Committee wrote: "Based on resident's testimony and evidence presented, the committee is convinced that resident is guilty of carrying kites and other unauthorized written material into the segregation unit and violated the trust in his law clerk position."
 
 
 15
 Defendant Hosier, then also a defendant in a pending civil rights suit for damages filed by Akbar, was chairman of the Committee. Although Akbar objected that he could not receive a fair hearing before Hosier, Hosier remained on the Committee.
 
 
 16
 The Committee imposed a disciplinary job transfer on Akbar, but reports of the violations were expunged from Akbar's record when another inmate verified Akbar's statement that the letters found in his possession were religious materials.
 
 
 17
 The jury awarded Akbar $3,500 compensatory damages for denial of an impartial decisionmaker and inadequate summaries of the evidence and reasons for the Committee decision. The jury also awarded Akbar $200 punitive damages against Defendant Hosier for refusing to disqualify himself from the Committee.
 
 D. Plaintiff Nalls
 
 18
 Melvin Nalls' resident disciplinary report, received March 14, 1980, accused Nalls of assaulting another inmate in violation of A.R. 804 Secs. (II)(A)-(1), (5), (6), (8), (10) & (28).
 
 
 19
 The Adjustment Committee, in a hearing held on March 16, found Nalls guilty. He was sentenced to one year in segregation, one year loss of good conduct time credit, a one-year demotion to C-grade status, and loss of audio-visual privileges. In the section "Record of Proceedings," the Committee wrote: "resident states he just got out of segregation 2 hours before incident occurred. He was not in gymnasium. Miranda warning was read prior to report having been read." In the section "Basis for Decision/Evidence Relied Upon," the Committee wrote:
 
 
 20
 Based on all evidence available, including the residents statements and the report from D. Polizzi indicating resident Nalls was observed in the shower room area at the gym and fact that resident Jones A15622 was assaulted, the Adjustment Committee is convinced that resident Nalls is guilty of assaulting another resident, creating a disturbance, unauthorized movement.
 
 
 21
 At trial, the jury awarded Nalls $1,000 compensatory damages for inadequate summaries of the evidence and reasons for the Committee decision.
 
 E. Plaintiff Armstrong
 
 22
 On February 9, 1980, Jeffrey Armstrong was charged in a resident disciplinary report with cursing and grabbing a guard in violation of A.R. 804 Secs. (II)(A)-(1), (2), (4), (5) & (6).
 
 
 23
 The Adjustment Committee found Armstrong guilty and sentenced him to thirty days in segregation and a six-month demotion to C-grade status. The Committee, in the section "Basis for Decision/Evidence Relied Upon," wrote: "Based on all available evidence, including the residents statements, the Adjustment Committee is convinced the resident is guilty of disregarding a prison rule, disrespect, cursing, and assaulting an employee by grabbing the employees arm."
 
 
 24
 Armstrong testified that his proper requests for witnesses were denied. In the section "Witnesses Called," the Committee wrote: "Witnesses were requested by the resident, however, based on the residents testimony, the Adjustment Committee is of the opinion the witnesses could offer no pertinent information or testimony to the situation."The jury awarded Armstrong $1,500 compensatory damages for denial of Armstrong's request to call witnesses and inadequate summaries of the evidence and reasons for the Committee decision.
 
 F. Plaintiff Tedder
 
 25
 Paul William Tedder complains about the procedures used at twelve separate Adjustment Committee hearings conducted during 1979 and 1980. Defendants Hosier, Shehorn, Santos, and Wheat sat as members of the Adjustment Committee during some of those hearings, and all refused to disqualify themselves despite Tedder's protests that they were prejudiced against him because they were defendants in pending lawsuits Tedder had filed.
 
 
 26
 Tedder did not make advance written requests to call witnesses. The Committee denied his oral requests made during some of the hearings. The Adjustment Committee found Tedder guilty at all twelve hearings:
 
 
 27
 (1) August 4, 1979--For violating A.R. 804 Sec. (II)(A)-(4) (using improper language), punishment of seven days in segregation was reduced by the warden to a verbal reprimand.
 
 
 28
 (2) August 10, 1979--For violating A.R. 804 Secs. (II)(A)-(1) & (3) (refusing properly authorized work or housing assignments), a sentence of fifteen days in segregation was imposed.
 
 
 29
 (3) September 30, 1979--For violating A.R. 804 Secs. (II)(A)-(1) & (3), a sentence of fifteen days in segregation and fifteen days of C-grade status was imposed.
 
 
 30
 (4) November 3, 1979--For violating A.R. 804 Sec. (II)(A)-(1), a sentence of fifteen days in segregation, fifteen days of C-grade status, and loss of audio-visual privileges was imposed.
 
 
 31
 (5) November 18, 1979--For violating A.R. 804 Secs. (II)(A)-(1) & (3), the same sentence Tedder received on November 3 was imposed.
 
 
 32
 (6) February 2, 1980--For violating A.R. 804 Secs. (II)(A)-(1), (2) (being disrespectful to an employee) & (4), a sentence of fifteen days of C-grade status was imposed.
 
 
 33
 (7) February 4, 1980--For violating A.R. 804 Secs. (II)(A)-(1) & (3), the same sentence Tedder received on November 3 was imposed.
 
 
 34
 (8) February 17, 1980--For violating A.R. 804 Secs. (II)(A)-(1) & (3), a sentence of fifteen days in segregation, thirty days of C-grade status, and loss of audio-visual privileges was imposed.
 
 
 35
 (9) March 2, 1980--For violating A.R. 804 Secs. (II)(A)-(1) & (3), the same sentence Tedder received on February 17 was imposed.
 
 
 36
 (10) March 16, 1980--For violating A.R. 804 Secs. (II)(A)-(4) & (8) (inciting a riot), a sentence of fifteen days in segregation, thirty days of C-grade status, and loss of audio-visual privileges was recommended by the Committee. The warden reduced segregation time to seven days and approved the other punishments.
 
 
 37
 (11) March 23, 1980--For violating A.R. 804 Secs. (II)(A)-(1) & (3), the same sentence Tedder received on November 3 was imposed.
 
 
 38
 (12) March 23, 1980--For violating A.R. 804 Secs. (II)(A)-(1), (2) & (4), the same sentence Tedder received on February 17 was imposed.
 
 
 39
 In the sections "Basis for Decision/Evidence Relied Upon," the Committee wrote:
 
 
 40
 (1) August 4, 1979--"Based on all evidence available, the Adj. Comm. is convinced the resident made improper and threatening remarks to the captain."
 
 
 41
 (2) August 10, 1979--"Based on all availble [sic] information presented to this committee, and residents testimony the committee is convinced resident is guilty of refusing to leave segregation."
 
 
 42
 (3) September 30, 1979--"Based upon all available information this committee believes resident guilty."
 
 
 43
 (4) November 3, 1979--"Based upon the evidence presented by the officer's report the resident of [sic] found guilty of refusing a new housing assignment and has thereby violated an institutional rule."(5) November 18, 1979--"Based on resident's testimony and all evidence presented, the committee is convinced that resident is guilty of refusing to leave segregation."
 
 
 44
 (6) February 2, 1980--"Based upon the evidence presented we find the resident guilty of cursing and not doing what he was told."
 
 
 45
 (7) February 4, 1980--"Residents testimony given and all evidence presented has convinced the committee the resident is guilty of refusing proper housing assignment, cursing a [sic] officer, and disobeying prison rules, and disobeying a direct order."
 
 
 46
 (8) February 17, 1980--"Based on all evidence available, the Adjustment Committee is convinced the resident is guilty of refusing proper housing."
 
 
 47
 (9) March 2, 1980--"Based on all evidence available, including the residents statements and the statement of the officer that Tedder did refuse to leave segregation, the Adj. Committee is convinced the resident is guilty of refusing proper housing, and disregarding a prison rule."
 
 
 48
 (10) March 16, 1980--"Based on all available evidence including the fact the reporting officer does identify resident Tedder as using vulgar and abusive language the Adjustment Committee is convinced the resident is guilty of using vulgar language and creating a disturbance."
 
 
 49
 (11) March 23, 1980--"Based on all evidence available including the statement of the reporting officer that the resident refused to leave segregation, the Adj. Comm. is convinced the resident is guilty of refusing proper housing."
 
 
 50
 (12) March 23, 1980--"Based on all evidence available, including the reporting employees statements that the resident did refer to the employee as 'you fuckers' and referred to Ms. Ruck as a 'bitch whore,' the Adj. Comm. is convinced the resident is guilty of disregarding a prison rule, disrespect, and using vulgar language."
 
 
 51
 The jury awarded Tedder no compensatory damages. The district court entered judgment in Tedder's favor for $1 nominal damages for denial of impartial decisionmakers and inadequate summaries of the evidence and reasons for the Committee decisions.
 
 G. Plaintiff Jones
 
 52
 Donald Jones received a resident disciplinary report on November 27, 1979, charging him with striking another inmate in violation of A.R. 804 Secs. (II)(A)-(1), (2) & (5). On November 30, the Adjustment Committee found Jones guilty as charged and recommended six months in segregation, a six-month demotion to C-grade status, and six months loss of good conduct time credit as punishment. In the section "Basis for Decision/Evidence Relied Upon," the Committee wrote: "All evidence presented and residents testimony given has convinced the committee the resident is guilty of striking a [sic] employee and or (resident) disrespecting a prison rule and order not to fight." The warden reduced each punishment to ninety days.
 
 
 53
 The jury awarded Jones no compensatory damages. The district court entered judgment in Jones' favor for $1 nominal damages for inadequate summaries of the evidence and reasons for the Committee decision.
 
 H. Plaintiff Woodruff
 
 54
 Donald Woodruff appeared before the Adjustment Committee on November 29, 1979, in response to a November 27 resident disciplinary report charging him with violating A.R. 804 Secs. (II)(A)-(1) & (4) by cursing and threatening a prison officer. The Committee found him guilty and sentenced him to seven days in segregation, a thirty-day demotion to C-grade status, and loss of yard privileges for thirty days.
 
 
 55
 The basis for the Committee decision was stated as follows: "All evidence presented and residents testimony given has convinced the committee the resident is guilty of improper use of language, and disobeying a direct order."Woodruff's claim was dismissed with prejudice by the district court before trial when he threatened to disrupt the proceedings, in part by refusing to wear clothes provided to him.
 
 II. DUE PROCESS
 
 56
 The application and extent of due process requirements to prison administration has been explored in many appellate opinions since the United States Supreme Court's decision in Wolff v. McDonnell, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974).[3] See Bartholomew v. Watson, 665 F.2d 915 (9th Cir.1982); Langton v. Berman, 667 F.2d 231 (1st Cir.1981); Smith v. Rabalais, 659 F.2d 539 (5th Cir.1981), cert. denied, 455 U.S. 992, 102 S.Ct. 1619, 71 L.Ed.2d 853 (1982); Jensen v. Satran, 651 F.2d 605 (8th Cir.1981), cert. denied, --- U.S. ----, 103 S.Ct. 1244, 75 L.Ed.2d 475 (1983); Chavis v. Rowe, 643 F.2d 1281 (7th Cir.), cert. denied sub nom., Boles v. Chavis, 454 U.S. 907, 102 S.Ct. 415, 70 L.Ed.2d 225 (1981); Hayes v. Thompson (Hayes II), 637 F.2d 483 (7th Cir.1980); Eugene v. Klecker, 636 F.2d 250 (8th Cir.1980); United States v. Warden, Stateville Correctional Center, 635 F.2d 656 (7th Cir.1980), cert. denied, 454 U.S. 843, 102 S.Ct. 156, 70 L.Ed.2d 128 (1981); Bono v. Saxbe, 620 F.2d 609 (7th Cir.1980); Rhodes v. Robinson, 612 F.2d 766 (3d Cir.1979); Hayes v. Walker (Hayes I), 555 F.2d 625 (7th Cir.), cert. denied, 434 U.S. 959, 98 S.Ct. 491, 54 L.Ed.2d 320 (1977); Aikens v. Lash, 514 F.2d 55 (7th Cir.1975), vacated, 425 U.S. 947, 96 S.Ct. 1721, 48 L.Ed.2d 191, on remand, 547 F.2d 372 (1976).
 
 
 57
 Prisoners are not afforded all of the rights and privileges guaranteed to other citizens, but neither are they "wholly stripped of constitutional protections." Wolff, 418 U.S. at 555, 94 S.Ct. at 2974. Also, the rights they enjoy are flexible and subject to limitations when balanced against the extraordinary situations that sometimes arise in prisons. We must balance the need for efficient and secure prisons against the prisoners' right to be protected against unwarranted losses of liberty. See Bono v. Saxbe, 620 F.2d at 618. We are keenly aware that prison officials have broad discretion to structure and operate a prison disciplinary system. "[A] court should [not] meddle in prison affairs unless legitimate constitutional issues are raised that require ... intervention." Bono v. Saxbe, 620 F.2d at 621 (Wood, J., concurring in part); see also Smith v. Rabalais, 659 F.2d at 545.
 
 
 58
 In prison disciplinary proceedings, the need to protect prisoners' procedural rights comes clearly into focus. Very little stands between the prisoner and the loss of his privileges. The Adjustment Committee hearings at the Pontiac prison are so numerous as to be almost routine. On the one hand, this means that prison officials are experienced and well-equipped to handle the hearings; on the other, the prison staff is burdened by a large number of hearings.
 
 III. ADJUSTMENT COMMITTEE PROCEDURES
 A. Disqualification
 
 59
 The district court incorrectly ruled that the holdings in Wolff v. McDonnell and Bono v. Saxbe require disqualification of all Adjustment Committee members who are defendants in unrelated civil suits for damages brought by the inmate appearing before the Committee. Although the requirement of a "neutral and detached" decisionmaker must not be impaired, disqualification is not necessary in every case.
 
 
 60
 On the issue of what constitutes a neutral and detached decisionmaking body, the Wolff Court ruled, in part, that an adjustment committee consisting of the Associate Warden for Custody (as chairperson), the Correctional Industries Superintendent, and the Reception Center Director was sufficiently impartial to satisfy due process. The Bono court approved qualifications suggested by the district court to ensure fairness, that is, that the hearing officer should have a "[l]ack of former personal involvement in any disciplinary or adjustment matter with the inmate." Bono v. Saxbe, 462 F.Supp. 146, 149-50 (E.D.Ill.1978) (appendix), aff'd, 620 F.2d 609 (7th Cir.1980). The district court in this case, in its order on summary judgment, construed Wolff and Bono to mean that disciplinary committee members "at least should not be defendants in pending lawsuits for damages instituted by the very persons over whom the committee sits in judgment."
 
 
 61
 The district court ruling unnecessarily extends Wolff 's reach. A prisoners' rights lawsuit often includes several defendants, some of whom may not know the plaintiff. Moreover, if an Adjustment Committee member is a defendant in the unrelated action named in her or his administrative capacity for performing ministerial duties, then the Committee member may have little personal involvement in the case. Under these circumstances, the Committee member's ability to serve as a neutral and detached decisionmaker at a hearing involving the plaintiff-prisoner may not be impaired, and disqualification may not be necessary. From a practical standpoint, requiring each staff member who is the subject of a separate lawsuit to disqualify himself from sitting in judgment of that inmate would heavily tax the working capacity of the prison staff. Additionally, prisoners may file many lawsuits naming multiple defendants. If every named defendant in a prisoners' rights lawsuit must be disqualified from sitting on the Adjustment Committee, such a litigation strategy would vest too much control in a prisoner to determine the Committee make-up. For these reasons, the disqualification issue should be decided on a case-by-case basis.
 
 
 62
 The Third Circuit has ruled, following Justice Marshall's concurrence in Wolff, 418 U.S. at 592, 94 S.Ct. at 2992, that due process prohibits "only those officials who have a direct personal or otherwise substantial involvement, such as major participation in a judgmental or decision-making role, in the circumstances underlying the charge from sitting on the disciplinary body." Rhodes v. Robinson, 612 F.2d at 773. Mandatory disqualification in this case would extend that position. Nevertheless, we believe that circumstances other than those arising directly out of the disciplinary process may raise such doubts about the integrity of the hearing procedure and the impartiality of its participants so as to trigger due process considerations.
 
 
 63
 We reverse the ruling of the district court requiring disqualification of every Committee member who is a defendant in a suit filed by the inmate appearing before the Committee. Our decision affects Plaintiffs Redding, Akbar, and Tedder. The record does not reflect the nature of the plaintiffs' pending lawsuits against the Committee members. Thus, we remand this issue to the district court with direction to evaluate the circumstances involved in the lawsuits and determine whether disqualification is required. Among other considerations, the district court should determine the extent of the Committee members' personal involvement in those lawsuits. The purpose of this inquiry is to protect individuals against arbitrary action of government. Wolff v. McDonnell, 418 U.S. at 558, 94 S.Ct. at 2975.
 
 B. Witnesses
 
 64
 Plaintiffs Redding, Akbar, Armstrong, Tedder, and Woodruff all claimed that their due process rights were denied when the Adjustment Committee refused their requests to call witnesses at the hearings. Plaintiffs Akbar, Woodruff, and Tedder, however, did not follow the required procedure for requesting witnesses. The administrative regulations require inmates to submit a request for witnesses desired in advance of the hearing. The district court approved that procedure, and did not allow those three claims to go to the jury. Those plaintiffs have not appealed that ruling. As a result, only the claims of Plaintiffs Redding and Armstrong are raised on appeal.
 
 
 65
 Plaintiffs Redding and Armstrong testified that they had properly requested witnesses. The administrative records in those cases support that testimony. The jury found that these plaintiffs were denied due process because their requests were denied without justification.
 
 
 66
 The right to call witnesses is basic to a fair hearing. Wolff v. McDonnell, 418 U.S. at 566, 94 S.Ct. at 2979; Bartholomew v. Watson, 665 F.2d at 918. Nevertheless, prison officials have the discretion to refuse inmates' requests for witnesses to protect institutional safety or to keep the length of the hearing within reasonable limits. But in this case no witnesses were allowed to testify at either hearing, and there is no indication that the requests were unreasonable. Furthermore, the only reason the Adjustment Committee offered for denying Plaintiff Redding's requests was that one of the three requested witnesses was off duty the day of the hearing. The Committee wrote on Plaintiff Armstrong's summary: "Witnesses were requested by the resident, however, based on the resident's testimony, the Adjustment Committee is of the opinion the witnesses could offer no pertinent information or testimony to the situation."
 
 
 67
 In Hayes I, 555 F.2d at 630, this court recognized that the Wolff Court declined to require a formal statement of reasons when requests for witnesses are denied. We noted, however, that some support for denial of witnesses should appear in the administrative record; without such a record judicial review would be meaningless. Id.; see also Hayes II, 637 F.2d at 486. The Adjustment Committee Summaries for Plaintiffs Redding and Armstrong do not enable us to determine whether the broad discretion of prison officials was exercised arbitrarily. See generally Langton v. Berman, 667 F.2d at 234 (allowing four of fifteen witnesses was not abuse of discretion). Accordingly, we must sustain the jury's determination that the denials of the requests for witnesses abridged those plaintiffs' due process rights.
 
 C. Committee Summaries
 
 68
 The principal issue in this appeal concerns the adequacy of the Adjustment Committee Summaries. Administrative Regulation 804 requires that these summaries enunciate the basis for the Committee's decision and specify the evidence underlying the ruling. See Aikens v. Lash, 514 F.2d at 60-61. This requirement is not to be taken lightly. The Supreme Court has written:
 
 
 69
 [T]he actions taken at such proceedings may involve review by other bodies. They might furnish the basis of a decision by the Director of Corrections to transfer an inmate to another institution because he is considered "to be incorrigible by reason of frequent intentional breaches of discipline," ... and are certainly likely to be considered by the state parole authorities in making parole decisions. Written records of proceedings will thus protect the inmate against collateral consequences based on a misunderstanding of the nature of the original proceeding. Further, as to the disciplinary action itself, the provision for a written record helps to insure that administrators, faced with possible scrutiny by state officials and the public, and perhaps even the courts, where fundamental constitutional rights may have been abridged, will act fairly. Without written records, the inmate will be at a severe disadvantage in propounding his own cause to or defending himself from others. It may be that there will be occasions when personal or institutional safety is so implicated that the statement may properly exclude certain items of evidence, but in that event the statement should indicate the fact of the omission. Otherwise, we perceive no conceivable rehabilitative objective or prospect of prison disruption that can flow from the requirement of these statements.
 
 
 70
 Wolff v. McDonnell, 418 U.S. at 565, 94 S.Ct. at 2979 (footnotes omitted).
 
 
 71
 In Hayes I, 555 F.2d at 631-33 & n. 1, this court rejected as inadequate an adjustment committee summary which stated: "Based on our review of the violation report and the report by the special investigator it is our motion that we find Mr. Hayes guilty as charged. We find that Mr. Hayes is guilty of conspiracy to incite to riot and commit mutinous acts." The committee report to Inmate Hayes stated: "The Committee's decision is based on the violation report as written and upon the report by the special investigator which during your absence was made part of the record." See United States v. Warden, Stateville Correctional Center, 635 F.2d at 659. The Hayes I court stated that the general finding, by merely incorporating the violation report and the special investigator's report, "does not ensure that prison officials will act fairly. Nor will this finding protect against subsequent collateral effects based on misunderstanding of the initial decision." Hayes I, 555 F.2d at 633. In Chavis v. Rowe, 643 F.2d at 1286-87, this court rejected as inadequate a summary which stated: "We recognize and consider the resident[']s statement[,] however[,] we accept the reporting officer[']s charges." The statement was deemed inadequate because "[i]t did not mention what evidence the reporting officer relied on, the investigatory report containing exculpatory evidence, or [an] earlier report. It gave no clear indication of why the reporting officer was to be believed rather than [the inmate] or [the victim, whose testimony favored the inmate]." The court stated that the defendants, "in failing to provide Chavis with a written statement giving facts relied on and reasons for the conclusions reached, ... violated Chavis' due process rights under Wolff, and also his right not to be found guilty except by an appropriate quantum of evidence." Id. at 1287.
 
 
 72
 We have looked long and hard at the eighteen summaries of the evidence before us. We are forced to conclude that none of them, standing alone, fulfills the essential functions stated in Wolff. Moreover, the summaries violate A.R. 804, which states that "[i]t will not be sufficient for the Committee's decision to simply adopt and copy the exact wording of the Resident Disciplinary Report," and violate the Due Process Clause, which requires the Committee to state not merely how it acts, but also why it acts in a particular manner. Many of the summaries are even less specific than the reports found constitutionally deficient in Hayes I. The phrases "based on all available evidence," or "all evidence presented" are conclusory; they do not disclose what evidence forms the bases of the Committee rulings. The Committee apparently gives credence to the resident disciplinary report in almost every case, but does not admit to doing so in its summaries. Also, no reasons are given for discounting the inmates' contradictory evidence.[4] See Chavis v. Rowe, 643 F.2d at 1287; see generally Kyle v. Hanberry, 677 F.2d 1386 (11th Cir.1982) (administrative record must reflect how disciplinary committee concluded that an unidentified informant was credible and reliable).
 
 
 73
 Evaluating the form summaries as a whole by combining the sections "Record of Proceedings" with the sections "Basis for Decision/Evidence Relied Upon" rescues two of the eighteen summaries from constitutional inadequacy. In the section "Record of Proceedings" for Plaintiff Jones, the Committee noted in part: "Resident states he struck resident due to he owed him money." In the section "Basis for Decision/Evidence Relied Upon," the Committee noted "residents testimony given." Because there was no conflict between the resident disciplinary report and testimony at the Committee hearing, it can be assumed that the Committee relied on Plaintiff Jones' own testimony to find him guilty. Similarly, the "Record of Proceedings" for the February 4, 1980, hearing on Plaintiff Tedder states in part: "resident states he was not going to be assigned with a Black, and this is why he refused [his housing assignment]." The plaintiff thus admitted his infraction, and the "Basis for Decision" notes: "Residents testimony given." It therefore can be assumed that the Committee relied on Plaintiff Tedder's admission to find him guilty, though the summary does not so state. Accordingly, the summary for Plaintiff Jones and the summary for Plaintiff Tedder's February 4, 1980, hearing satisfy minimum constitutional requirements. The district court's ruling on these two summaries is reversed.
 
 
 74
 In the sixteen remaining summaries the inmates either denied guilt or refused to answer the charges. Therefore, even reading the summaries as a whole provides no clue as to why the Committee acted as it did. Accordingly, in those sixteen instances the judgment of the district court holding the summaries constitutionally inadequate is affirmed.
 
 
 75
 The line between constitutional adequacy and inadequacy is a fine, but important one. When the Committee writes "based on all available evidence the resident is guilty," no agency or court can discern the basis for the Committee's rulings. If, however, the Committee writes "resident is lying," or "the guard saw him therefore ...," or "resident admits he committed the act charged," or "resident does not refute charges," or another statement establishing the evidence underlying its decision, then the inmate is protected from a mischaracterization of the disciplinary action when it comes under review.[5]
 
 
 76
 Prisoners enjoy privileges and rewards which can be taken away when they misbehave. When a prisoner loses the opportunities to shower daily, exercise daily, visit with other prisoners, use the library, watch television, and visit the commissary, he has lost much. Each aspect of the freedoms most of us take for granted becomes more precious as the totality of freedom is reduced. Forfeiting good conduct time credit is perhaps the most serious loss. Prisoners thus must be protected from arbitrary actions extinguishing their privileges. The surest protection is an impartial decisionmaker. And the integrity of that decisionmaker can be insured only if she or he enunciates the bases for her or his actions. The Committee summaries before us do not satisfy that minimal requirement.
 
 IV. TRIAL
 A. Woodruff Dismissal
 
 77
 In their cross-appeal, the plaintiffs contend that the district court improperly dismissed Plaintiff Woodruff for threatening to disrupt the trial. The plaintiff, while waiting to enter the courtroom, ripped off clothes provided to him and threatened to rip them off again in court. The district judge decided that he could not allow the plaintiff an opportunity to carry out that threat.
 
 
 78
 The sanction of involuntary dismissal with prejudice is severe, and should be used only when lesser sanctions are inappropriate or ineffective. See, e.g., McCargo v. Hedrick, 545 F.2d 393 (4th Cir.1976). In Botany v. Heeringa, 521 F.Supp. 1369 (E.D.Wis.1981), for example, the district court faced a pro se state prison inmate alleging under Section 1983 that his civil rights were violated. That plaintiff seriously disrupted the trial. The court, recognizing that the usual punishments for contempt would be ineffectual against a prisoner who sued in forma pauperis, dismissed the case with prejudice in order to preserve the orderly operation of the court.
 
 
 79
 The decision to dismiss the plaintiff's claims falls within the discretion of the district court, and absent an abuse of that discretion we will affirm its judgment. The record supports the court's finding that the plaintiff threatened to disrupt the proceedings. We think the court acted properly in the face of Plaintiff Woodruff's "disruptive, contumacious, stubbornly defiant" conduct. Illinois v. Allen, 397 U.S. 337, 343, 90 S.Ct. 1057, 1060, 25 L.Ed.2d 353 (1970). The court weighed the plaintiff's rights, the threat of disruption, and the consequences of declaring a mistrial in an action involving seven other plaintiffs and eighteen defendants if Plaintiff Woodruff misbehaved in front of the jury. Under the unusual circumstances of the case the district court's action was justified.
 
 B. Immunity
 
 80
 The defendants argue that they are entitled to absolute, "quasi-judicial" immunity from liability for money damages. The issue has been fully discussed and decided by this circuit. Chavis v. Rowe, 643 F.2d at 1288; Mary v. Ramsden, 635 F.2d 590 (7th Cir.1980). See also Hayes II, 637 F.2d at 489-90. Despite contrary authority from the en banc Fourth Circuit, which embraced the defendants' view in Ward v. Johnson, 690 F.2d 1098 (4th Cir.1982), we believe that the position stated in Chavis and Mary and adopted by other circuits, see, e.g., Jihaad v. O'Brien, 645 F.2d 556 (6th Cir.1981), represents the better view. See Ward v. Johnson, 690 F.2d at 1114-17 (Winter, C.J., dissenting). The district court's determination that the defendants enjoy only qualified, "good faith" immunity is affirmed.
 
 C. Evidence Beyond Administrative Record
 
 81
 The district court erred at trial by refusing to allow the defendants' evidence of the extent of injuries beyond that contained in the administrative records, which consisted of Adjustment Committee Summaries and disciplinary reports. The defendants correctly contend that they should have been allowed to submit evidence beyond the administrative record on the damages issue once the constitutional violations were established. For this contention, they rely principally on reasoning implicit in the Supreme Court's decision in Carey v. Piphus, 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978).
 
 
 82
 In response, the plaintiffs argue that Carey does not control the result in this case; that admitting such additional evidence would allow prison officials to violate due process rights with impunity, safe in the knowledge that the prisoners never could collect much money even if they prove constitutional violations; that the district court will be forced to conduct mini-trials on damages; and that the district court's decision must therefore be affirmed.
 
 
 83
 Although Carey leads us in the right direction, it does not fully answer the question presented. The Carey Court held that the plaintiffs, who complained of being suspended from high school without a hearing, must prove actual injury to recover substantial damages. The Court noted with approval this circuit's position that if the disciplinary action taken against the plaintiffs would have occurred absent the due process violation, then an award of damages would constitute a windfall, rather than compensation, to the plaintiffs. Carey v. Piphus, 435 U.S. at 260, 98 S.Ct. at 1050. This circuit wrote on that issue:
 
 
 84
 On remand, therefore, as counsel for plaintiffs recognized at oral argument, if a plaintiff seeks to recover damages flowing from his suspension, the defendants will be entitled to offer evidence showing that there was just cause for the suspension and that therefore he would have been suspended even if a proper hearing had been held.
 
 
 85
 Piphus v. Carey, 545 F.2d 30, 32 (7th Cir.1976), rev'd on other grounds, 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978).
 
 
 86
 Neither the Supreme Court nor this court considered what evidence would be admissible to prove the extent of damages. Apparently, though, there was little or no administrative record compiled in Carey, for the plaintiffs complained that they never received a proper hearing. We think, therefore, that both courts contemplated admission of evidence beyond that recorded in administrative proceedings. This position is bolstered by a footnote in Carey, 435 U.S. at 261 n. 16, 98 S.Ct. at 1051 n. 16, in which the Supreme Court addressed the plaintiffs' argument that the effects of any additional evidence on the discretionary judgment of the initial decisionmaker could never be discovered. The Court wrote:
 
 
 87
 This holding ... necessarily assumes that the District Court can determine what the outcome would have been if [the plaintiffs] had received their hearing. We presume that this determination will include consideration of the likelihood that any mitigating circumstances to which [the plaintiffs] can point would have swayed the initial decisionmakers.
 
 
 88
 The plaintiffs argue that Hayes II, 637 F.2d at 488, holds that the defendants' actions must be supported by the administrative record. Hayes II is distinguishable, however, because the court there was concerned with proof of the alleged constitutional violation, not proof of whether any injuries would have occurred even in the absence of a constitutional violation.
 
 
 89
 Most appellate decisions implicitly support the defendant's position. See, e.g., Reel v. Arkansas Department of Correction, 672 F.2d 693 (8th Cir.1982) (Section 1983 action by employee against employer); Busche v. Burkee, 649 F.2d 509 (7th Cir.), cert. denied, 454 U.S. 897, 102 S.Ct. 396, 70 L.Ed.2d 212 (1981) (Section 1983 action by employee alleging termination without due process); Kendall v. Board of Education, 627 F.2d 1 (6th Cir.1980) (action by teacher alleging unconstitutional firing); Rodriguez de Quinonez v. Perez, 596 F.2d 486 (1st Cir.), cert. denied, 444 U.S. 840, 100 S.Ct. 78, 62 L.Ed.2d 51 (1979) (Section 1983 action by bank directors alleging unconstitutional firing). In Busche, 649 F.2d at 516, this court specifically recognized a fact relevant to mitigation of damages which could not have been included in the administrative record. See also id. at 516 n. 9.
 
 
 90
 The plaintiffs are put to the proof of their damages. Then the defendants may show that there were no actual injuries, despite the constitutional violations. The only satisfactory method to determine the true extent of damages is to allow each side to muster all relevant evidence. Anything less could afford the plaintiffs an undeserved award.
 
 
 91
 The plaintiffs' fear that this decision eliminates an important check on the behavior of prison officials is unfounded. Other consequences flow from violations of constitutional rights--especially when the official misconduct is malicious--including injunctive relief and punitive damages, which do not depend on proof of actual injury. Endicott v. Huddleston, 644 F.2d 1208 (7th Cir.1980).
 
 D. Expunction and Injunctive Relief
 
 92
 The expunction of a disciplinary violation from a prisoner's record may be appropriate when that violation was established contrary to due process guarantees. Hayes II, 637 F.2d 493. We have ruled that in sixteen cases the Adjustment Committee Summaries were constitutionally inadequate. No agency or court in the future will be able to properly assess the basis for the Committee's decisions in those cases. Undeserved adverse collateral consequences could flow from these guilty findings if they are allowed to remain in the inmates' records. On the other hand, we also have found that the Committee members' refusal to disqualify themselves, found unconstitutional by the district court, may not have been improper.
 
 
 93
 The decision to expunge a violation from an administrative record should result from balancing the interests of the parties. The defendants have an interest in maintaining accurate records and insuring prison security. The plaintiffs' interest in avoiding adverse consequences is apparent. Here it seems that the plaintiffs' interests outweigh the defendants' interests. Nevertheless, we believe that the district court should balance the equities and exercise its discretion, with the guidance of this court's discussion in Hayes II, 637 F.2d at 493.
 
 
 94
 Expunction clearly is not warranted for Plaintiff Jones and the February 4, 1980, hearing for Plaintiff Tedder. Additionally, the jury's conclusion that Plaintiff Tedder was not injured by any of the twelve hearings indicates that expunction may not be appropriate for any of his claims. The district court on remand should reconsider the appropriateness of ordering expunction for Plaintiffs Nalls, Armstrong, and Tedder.
 
 
 95
 The district court also should reconsider the propriety of the plaintiffs' requests for injunctive relief in light of our disposition of the issues.
 
 E. Tedder's Damages
 
 96
 Plaintiff Tedder argues that he should receive $1 nominal damages for each separate violation of his procedural due process rights. (The plaintiff asks for $12, but one of the twelve hearing summaries was constitutionally adequate.)
 
 
 97
 Nominal damages are not compensation for loss or injury, but rather recognition of a violation of rights. Nominal damages do not measure anything. The plaintiff's argument thus must be rejected; we will not disturb the district court's decision to award only $1 nominal damages.
 
 F. Attorney's Fees and Costs
 
 98
 We review the district court's fee decision under 42 U.S.C. Sec. 1988 (1980) only for an abuse of discretion. Whitley v. Seibel, 676 F.2d 245 (7th Cir.), cert. denied, --- U.S. ----, 103 S.Ct. 254, 74 L.Ed.2d 198 (1982).
 
 
 99
 Pursuant to itemized statements submitted by the plaintiffs' counsel detailing fees and costs, the district court awarded $14,995 fees and $1,437.96 expenses. We think the award was proper. See, e.g., Whitley v. Seibel, 676 F.2d at 253-54; Reel v. Arkansas Department of Corrections, 672 F.2d at 697-98; Northcross v. Board of Education, 611 F.2d 624 (6th Cir.1979), cert. denied, 447 U.S. 911, 100 S.Ct. 2999, 64 L.Ed.2d 862 (1980); Loewen v. Turnipseed, 505 F.Supp. 512 (N.D.Miss.1980).
 
 
 100
 The defendants argue that all but $403 of the costs and expenses should be disallowed because they were for transportation to and from court, phone calls, and other related expenses. We think, however, that the district court did not abuse its discretion in determining that those costs were reasonable and necessary to conduct the litigation. See Northcross, 611 F.2d at 639.
 
 
 101
 The defendants' second argument, that the fee award must be reduced in this case--which was litigated as a single action after counsel was appointed--because one plaintiff was dismissed and two others received only nominal damages, is incorrect. See Hensley v. Eckerhart, --- U.S. ----, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). "Where a lawsuit consists of related claims, a plaintiff who has won substantial relief should not have his attorney's fees reduced simply because the district court did not adopt each contention raised." Id. at ----, 103 S.Ct. at 1943. All the claims in this lawsuit are related; the lawyer's time cannot be apportioned among them.
 
 
 102
 Finally, we agree with the district court that an award of attorney's fees to a prisoner appearing pro se is not appropriate under Section 1988. See, e.g., Cofield v. Atlanta, 648 F.2d 986 (5th Cir.1981); Lovell v. Snow, 637 F.2d 170 (1st Cir.1981). The plaintiffs' request for fees covering the time which the plaintiffs individually expended on the case was properly denied.
 
 V. SUMMARY
 
 103
 The district court's ruling requiring disqualification of all Adjustment Committee members who are defendants in lawsuits filed by the inmate appearing before the Committee is reversed and the issue remanded so the district court can analyze the circumstances surrounding each unrelated lawsuit to determine whether disqualification was required. The judgments of the district court awarding punitive damages to Plaintiffs Redding and Akbar based on the disqualification issue are reversed.
 
 
 104
 The district court's ruling allowing the jury to consider damages because the Adjustment Committee refused to call witnesses for Plaintiffs Redding and Armstrong is affirmed. The district court properly recognized the plaintiffs' limited right to call witnesses.
 
 
 105
 The district court's ruling that the Adjustment Committee Summaries presented in this case fell short of minimum constitutional standards is reversed as to Plaintiff Jones and the February 4, 1980, hearing for Plaintiff Tedder. The ruling is affirmed as to the other sixteen summaries.
 
 
 106
 The district court's judgment dismissing Plaintiff Woodruff's claims is affirmed.
 
 
 107
 Adjustment Committee members enjoy only qualified immunity, not absolute immunity, from damages liability.
 
 
 108
 The district court's judgments on the jury verdicts awarding compensatory damages to Plaintiffs Redding, Akbar, Nalls, and Armstrong are reversed in light of our decision that the district court improperly denied the defendants an opportunity to present evidence beyond the administrative record on the issue of damages. The damages issues are remanded. The judgment awarding Plaintiff Jones $1 nominal damages is reversed. The judgment awarding $1 nominal damages to Plaintiff Tedder is affirmed.
 
 
 109
 The district court's judgment awarding attorney's fees, costs, and expenses and denying pro se fees is affirmed.
 
 
 110
 In conclusion, we applaud the excellent legal work performed by the plaintiffs' counsel as reflected in the record and the briefs before this court.
 
 
 111
 AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.
 
 
 
 *
 The Honorable Max Rosenn, Senior Judge of the United States Court of Appeals for the Third Circuit, is sitting by designation
 
 
 [1]
 Also named as defendants were five unknown members of the Pontiac Correctional Center Adjustment Committee
 
 
 [2]
 Every disciplinary report contains the following paragraph:
 Please be advised that you have the right to appear before the Adjustment Committee and contest this rule violation charge by presenting a written or oral statement or explanation of your actions. You may present to the Committee relevant physical exhibits such as records or documents; you have a right to ask that witnesses be interviewed, and if necessary in the Committee's judgment, you may be called to testify during your hearing. In addition, you may ask the Committee to question the witness along lines you suggest. You must indicate in advance of the hearing the witnesses you wish to have interviewed by filling out the appropriate space on this form, tearing it off, and returning it to the Committee. If you are illiterate or seriously handicapped, you may have the assistance of a staff counselor to help you prepare a defense. You may request a reasonable extension of time to prepare for your hearing. If you are found guilty of a serious rule violation and are found to be a danger to the institutional community, you may be placed in segregation and/or deprived of your current grade and statutory good time credit.
 
 
 [3]
 The Wolff Court ruled that a prisoner should receive advance written notice of the charges against him, an opportunity to prepare and present a defense, and a written statement by the fact-finders as to the evidence relied on and reasons for the disciplinary action
 
 
 [4]
 We note further that none of the eighteen summaries states the reasons underlying the nature and amount of punishment imposed. The punishments can be severe. A prisoner is better protected from arbitrary and unfair punishments when reasons for the amount of punishment are articulated
 
 
 [5]
 The defendants compare the following Adjustment Committee Summary for Plaintiff Nalls (easily the best summary of the 18 before us):
 Based on all evidence available, including the residents statements and the report from D. Polizzi indicating resident Nalls was observed in the shower room area at the gym and the fact that resident Jones A15622 was assaulted, the Adjustment Committee is convinced that resident Nalls is guilty of assaulting another resident, creating a disturbance, unauthorized movement[,]
 with one of their own making:
 The question of Mr. Nalls guilt or innocence requires the Committee to weigh credibility. We do not find Mr. Nalls' testimony that he was not in the gym credible. As stated in the report of the Investigator, a positive identification of Nalls was made by Dillman in the gym. Resident Jones was stabbed. Nalls was the only person seen in close proximity to Jones at the time of the stabbing. We therefore find as a fact that Nalls stabbed Resident Jones.
 The defendants claim that beyond insertion of legal niceties the two summaries say "basically the same thing." Appellants' br. at 52. They go on to claim that any distinction drawn between them would be exalting form over substance by focusing on "hyper-technical semantic distinctions and legal 'buzz-words.' " But a second glance shows that even the defendants' example is superior to the Committee summary. While the summary restates part of the record, the example specifically notes that the Committee discounts the inmate's statements in favor of the investigator. Further, the example clearly states the two pieces of evidence on which the Committee relies in reaching its decision. The summary merely states: "Based on all evidence available."
 The Constitution does not require the words "credibility" or "proximity" or "positive identification." Due process simply requires a statement of what evidence forms the basis for the Committee finding. Such a statement is more than a boilerplate sentence to be applied in every case, but not so complex as to require a lawyer to draft it. The summary discussed in Busche v. Burkee, 649 F.2d 509, 516 (7th Cir.), cert. denied, 454 U.S. 897, 102 S.Ct. 396, 70 L.Ed.2d 212 (1981), is an example of a simple summary of findings which satisfies due process requirements.