In the
United States Court of Appeals
For the Seventh Circuit

No. 00-2425

Phil White,

Petitioner-Appellant,

v.

Indiana Parole Board,

Respondent-Appellee.

Appeal from the United States District Court
for the Northern District of Indiana, South Bend Division.
No. 3:99cv0633S--Allen Sharp, Judge.

Argued June 7, 2001--Decided September 26, 2001



   Before Coffey, Easterbrook, and Rovner,
Circuit Judges.

   Easterbrook, Circuit Judge.  While
confined in the Marion County Jail, Phil
White was accused of drug trafficking
with the aid of Yvonne Davis, a prison
employee, and Shaquilla Harrison, Davis's
daughter (and the mother of White's
child). The prison's Conduct Adjustment
Board stripped White of 120 days' good-
time credit; it also reduced his credit-
earning classification. White took two
administrative appeals, first to the
warden and then to a tribunal maintained
by the Indiana Department of Corrections.
Both the warden and the Department
sustained the Board's decision, although
the Department increased White's credit-
earning rate. Indiana does not provide
judicial review of such actions, so
White's next stop was federal court,
where he contends in this action under 28
U.S.C. sec.2254 that the Board did not
afford him due process of law. See
Edwards v. Balisok, 520 U.S. 641 (1997).
White complains that the officer who
investigated and filed the trafficking
charge conferred with the Board's members
after the close of evidence, and that he
did not receive a copy of a videotaped
interview Davis had with investigating
officers. The district court denied the
petition.

1. The day after oral argument of his appeal, White was released on parole. Indiana contends in supplemental memoranda filed at our request that White's parole makes this proceeding moot, on the theory that only the terminal date of his sentence--a date unaffected by good-time credits-- now concerns him. The Board's decision delayed his parole but does not affect how long parole continues after release. Indiana law provides that parole never lasts more than two years, or the end of the sentence, whichever comes first. I.C. sec.35-50-6-1. White was paroled on June 8, 2001, so his supervision will end on June 7, 2003, three days before his sentence expires. More good-time credits would not advance the expiration of his sentence. Majors v. Broglin, 531 N.E.2d 189 (Ind. 1988). Because neither the two-year period nor the end of the sentence depends on the disciplinary action, the state contends that the Board's decision has no current consequences and the case must be moot. See Spencer v. Kemna, 523 U.S. 1 (1998); Murphy v. Hunt, 455 U.S. 478 (1982).

The difficulty with this position is that it disregards the link between good-time credits and release on parole. The Board's decision postponed the start of White's parole by approximately six months. Because parole in Indiana lasts a maximum of two years, the Board's decision also postpones the end of White's supervision: had he been released, say, on December 8, 2000, his parole would be over by December 7, 2002, rather than June 7, 2003. This means that the federal court has the power to affect the duration of White's custody (for parole is a form of custody): If the disciplinary hearing is deemed defective, the court may order Indiana to terminate White's parole when it would have expired, but for the Board's decision on the drug-trafficking charge. The proceeding is not moot.

2. Indiana offers a second procedural contention: that unless the Board's procedures contravene a decision of the Supreme Court, or apply that Court's decisions unreasonably, collateral relief is precluded. The state relies on 28 U.S.C. sec.2254(d), as amended by the Antiterrorism and Effective Death Penalty Act of 1996:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--

(1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Both the language of the aedpa and Williams v. Taylor, 529 U.S. 362, 412 (2000), show that, when this provisionapplies, decisions of courts other than the Supreme Court must be disregarded. Only that Court's own decisions, and not glosses applied by other tribunals, may be enforced on collateral review. Cf. Tyler v. Cain, No. 00-5961 (U.S. June 28, 2001). This could be a substantial advantage for Indiana, because Wolff v. McDonnell, 418 U.S. 539 (1974), the Supreme Court's principal decision articulating procedural requirements for prison disciplinary hearings, does notdirectly support either branch of White's argument.

  But does sec.2254(d) apply? White is "a person in custody pursuant to the judgment of a State court", but how was his "claim . . . adjudicated on the merits in State court proceedings"? The Conduct Adjustment Board is not a court, and Indiana did not afford judicial review of such a Board's decision. How then could sec.2254(d) be relevant? According to the state, sec.2254(d) uses the word "court" in different ways. The first reference ("judgment of a State court") uses the word in its normal sense, as an institution with legally trained judges following rules of evidence and adversarial procedure with lawyers available to both sides. (Only such an institution may enter a lawful judgment committing an accused to prison.) The second time the word appears ("adjudicated on the merits in State court proceedings"), according to the

state, it takes a special sense equivalent to "any adjudicatory body." Agencies can and do adjudicate even though they follow inquisitorial procedures and lack lawyers; the Board is an agency; hence, Indiana insists, it is a "court" for purposes of sec.2254(d).

This is not a natural reading of the word--not only because it is unusual to treat agencies as courts but also because it requires the word "court" to have two meanings in one sentence. Still, the state has some support in this circuit's decisions. Markham v. Clark, 978 F.2d 993 (7th Cir. 1992), reads the word "court" in sec.2254(b)(1)(A) to include all adjudicatory bodies. (Markham predates the aedpa, but the language it interpreted has been carried forward with minimal change.) Section 2254(b)(1)(A) requires state prisoners to exhaust "the remedies available in the courts of the State" before seeking collateral relief in federal court. Markham holds that an appellate apparatus within a prison system is a "court" for this purpose and thus that state prisoners deprived of good-time credits must use all available administrative remedies. That is why White had to appeal to the warden and then the Indiana Department of Corrections before seeking federal review. Section 2254(c) supports this usage of the word "court" by providing that "[a]n applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented." (Emphasis added.)

One could read sec.2254(c) as limited to any judicial procedure (so that state prisoners must resort to collateral attacks, mandamus, and other remedies, as well as direct appeals), but Markham concluded that it means any procedure at all, judicial or not. Nothing like sec.2254(c) enlarges the definition of "court" for purposes of sec.2254(d), and the latter section serves a function-- enlarging the extent to which state judgments receive full faith and credit, despite provision for collateral attacks- -that is more closely linked to the traditional understanding of a court.

Markham has a second theme: that "how

states carve up adjudicative functions between courts and agencies is in general and in this particular no business of the federal courts, for the Constitution does not prescribe any particular allocation or separation of powers among the states. . . . If one state wants to use an administrative body where another state would use a conventional 'court,' its choice is a matter of indifference from the standpoint of the principles of federalism and comity". 978 F.3d at 995. This is undoubtedly true for many subjects; states may (and do) allocate some apparently legislative powers to judges, and adjudicatory powers to non-tenured officials (whether called courts or agencies). But a few federal laws recognize differences among branches of state government. One of these is the Full Faith and Credit Clause, Art. IV sec.1, which provides: "Full Faith and Credit shall be given in each State to the public Acts, Records, and judicial Proceedings of every other State. And the Congress may by general Laws prescribe the Manner in which such Acts, Records and Proceedings shall be proved, and the Effect thereof." (Emphasis added.) Section 2254(d) specifies the extent to which states' decisions must be respected in collateral attacks and thus like 28 U.S.C. sec.1738 exercises the power granted by the second sentence of the Full Faith and Credit Clause. We know from University of Tennessee v. Elliott, 478 U.S. 788 (1986), that for purposes of sec.1738 a state agency is not a judicial body, and that a federal tribunal therefore may reexamine de novo issues determined by a state agency but not reviewed by that state's judiciary. See also Astoria Federal Savings & Loan Ass'n v. Solimino, 501 U.S. 104 (1991). Cf. Cleavinger v. Saxner, 474 U.S. 193 (1985) (members of prison disciplinary boards are not treated as judges for the purpose of absolute immunity). Elliott and Astoria strongly imply that state disciplinary boards are not the sort of "courts" whose decisions have independent legal force when Congress provides for federal review of the same topics. If administrative decisions do not have preclusive effect under sec.1738 (or the Full Faith and Credit Clause itself), why should they have preclusive effect under sec.2254?

Nonetheless, our early encounters with

sec.2254(d) as amended by the aedpa did not sharply distinguish judicial from administrative decisionmakers. Evans v. McBride, 94 F.3d 1062 (7th Cir. 1996), reserved the question whether the amended sec.2254(d) applies to cases pending when the aedpa was enacted, implying in the process that if it does apply then a disciplinary board is a "court"--for the petitioner in Evans was seeking relief from a decision concerning good-time credits, and the state judiciary had not addressed his contentions. We wrote in Evans, 94 F.3d at 1065: "Our circuit has issued a number of opinions requiring prison disciplinary officials to explain their actions more fully, . . . but if these are extensions of (rather than glosses on) the decisions of the Supreme Court, they provide a poor foundation for relief under the amended sec.2254." Yet disregard of circuit-level precedent would be required by sec.2254(d) only if prison disciplinary boards count as "courts." Evans did not go further, but its implication has been repeated in dictum by several later cases, none of which analyzes the issue beyond citing Evans, which itself did not analyze the question. See, e.g., Gaither v. Anderson, 236 F.3d 817, 819-20 (7th Cir. 2001); Sweeney v. Parke, 113 F.3d 716, 719 (7th Cir. 1997).

   Section 2254 is one among many parts of the aedpa that make the handling of federal collateral attack turn on what a state "court" has done. Another is sec.2253(c), which says:

(1)  Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from--

(A)  the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court; or

(B)  the final order in a proceeding under section 2255.

Does a state prisoner need a certificate of appealability when seeking federal collateral review of a prison disciplinary board's decision revoking good-time credits? We gave a negative answer in Walker v. O'Brien, 216 F.3d 626 (7th Cir. 2000), holding among other

things that the additional time served as a result of a disciplinary board's decision is not "detention [that] arises out of process issued by a State court". That conclusion was debated within the court; three judges thought that detention "arises out of process issued by a State court" whenever imprisonment has been authorized by a criminal sentence. 216 F.3d at 642-44. Thus it is possible to see how collateral attacks concerning good-time credits could require certificates of appealability even if a disciplinary board is not a "court"; but it is impossible to see how, if a disciplinary board is a "court," an appeal would be possible without a certificate of appealability. The assumption made in cases such as Evans therefore is irreconcilable with the holding of Walker in addition to the holdings of Elliott and Cleavinger.

To eliminate the tension among this court's decisions, we now disapprove any language in Evans, Sweeney, Gaither, and similar opinions implying that prison disciplinary boards are "courts" for the purpose of 28 U.S.C. sec.2254(d). That portion of the aedpa accordingly does not affect collateral review of decisions revoking good-time credits unless states provide for judicial review of these decisions--review that under sec.2254(c) (as interpreted in Markham) a prisoner must pursue. White did pursue all available state corrective processes, but Indiana does not make a judicial process available, so sec.2254(d) does not give that state the benefit of limitation on the scope of federal collateral attack. (So far as we can tell, this decision is the first anywhere in the country to produce a holding, as opposed to dicta, about the question. Evans, Sweeney, and Gaither at least adverted to the question, though they did not resolve it. Courts elsewhere do not ever advert to the subject. For example, the eighth circuit has treated prison disciplinary boards as courts with no explanation, see Closs v. Weber, 238 F.3d 1018 (8th Cir. 2001), while the fifth circuit has employed de novo review with no explanation, see Broussard v. Johnson, 2001 U.S. App. Lexis 14170 (5th Cir. June 25, 2001); Hudson v. Johnson, 242 F.3d 534 (5th Cir. 2001).)

3. Now we arrive at the merits, where

our conclusion that the Board is an agency rather than a court has a different significance. White's principal contention is that the Board violated the due process clause of the fourteenth amendment because Officer Thompson, who prepared the conduct report charging him with drug trafficking, remained in the hearing room after the close of the evidence and, we must presume, discussed the charge with the Board's members before or even during their deliberations. (Because there is no written record, we cannot tell how long Thompson remained and thus we indulge the assumption that he stayed through the deliberations.) If the Board were a court, ex parte proceedings would be irregular and would raise constitutional issues--and although the due process clause does not apply to the states every ethical requirement for federal judges, see Del Vecchio v. Illinois Department of Corrections, 31 F.3d 1363 (7th Cir. 1994) (en banc), receipt of evidence off the record, or lobbying in chambers by a witness for one side, would be a substantial problem under the Constitution. But non-record discussions between an agency's decisionmakers and members of the agency's staff are common and proper; for example, Commissioners of the Federal Trade Commission routinely discuss pending cases with that agency's economic staff, even though the economists also give counsel to (and testify for) the agency's internal prosecutor (the Bureau of Competition). When the Chairman of the ftc has a private meeting with the agency's Chief Economist, does this spoil all cases then under advisement? Hardly. Agencies and courts have different methods of resolving disputes; what is unthinkable for a court may be normal for an agency; and although the ftc must in the end defend its decisions by reference to the administrative record, no rule of law prevents the Commissioners (or, say, Members of the National Labor Relations Board) from discussing pending matters with agency employees. See 5 U.S.C. sec.554(d).

   Once a person has been convicted and the sentence specified by a court, informal proceedings determine how much of that sentence must be served. The role (and the propriety) of ex parte contacts are clearest in the pardon process. Governors

rarely hold hearings on the record; they receive information and advice from many sources, including prosecutors, victims, and witnesses. None of these steps is constitutionally questionable, and none becomes so if the governor delegates the pardoning power to an agency that holds formal hearings; a governor (or other holder of the pardoning power) need not provide any process at all and may resolve matters as he pleases. See Connecticut Board of Pardons v. Dumschat, 452 U.S. 458 (1981). Likewise with parole. See Greenholtz v. Nebraska Penal Inmates, 442 U.S. 1 (1979). Officials empowered to act on applications for release regularly use informal process, receiving unsworn (and sometimes off-the-record) recommendations from prosecutors, victims, and witnesses. In the wake of Wolff decisions about good-time credits are subject to more constitutional limitations than decisions about pardons or parole, but Wolff did not require disciplinary boards to follow the judicial model. To the contrary, Wolff concluded that disciplinary boards need not place on the record all of the evidence that influences their decisions. The Court recognized that considerations of institutional security may militate against full disclosure. In White's own proceeding, although a "Report of Conduct" detailing the charge was made available, a separate "Case Report" was held in confidence, a step that White does not contest. If the Case Report could be held back--as portions of presentence reports in criminal prosecutions may be held back--it is hard to see how there could be a constitutional objection to allowing Officer Thompson to discuss that Case Report with the Board in confidence. We do not know what Thompson said to the Board's members and thus cannot be sure that his contribution was limited to discussing the portion of the evidence that was legitimately held in confidence, or subjects such as selecting the right penalty; this is an inevitable consequence of off-the-record discussions. But it is a risk common to all non-record proceedings; a reviewing court cannot know what happened even in the public portions of a prison disciplinary hearing.

Because prison disciplinary boards are entitled to receive, and act on,

information that is withheld from the prisoner and the public, they must be entitled to discuss that evidence off the record with persons who know its significance. Wolff holds that prisoners are entitled to impartial decisionmakers--Thompson could not have been given a vote on the Board, see 418 U.S. at 570-71; Merritt v. De Los Santos, 721 F.2d 598 (7th Cir. 1983); Whitford v. Boglino, 63 F.3d 527, 534 (7th Cir. 1995)--but there is no reason to believe that the members of this Board were other than impartial. Listening to a point of view does not constitute bias. If it did, judges could not listen to witnesses or lawyers who represent adversarial positions, and they probably could not consult with the authors of presentence reports or read articles in law reviews, for both presentence-report writers and professors may have axes to grind. Disciplinary boards are made up of prison employees; Thompson surely was talking to this panel's members routinely, and on other occasions Thompson likely served as a member and received evidence presented by the officers who made up White's disciplinary panel. Such daily camaraderie and mixing of roles pose greater threats to impartiality than does listening to commentary on off-the-record evidence in a particular case--yet it is clear from Wolff that the Constitution does not require prisons to import professional decisionmakers such as administrative law judges to run the disciplinary process. The Court could have required a more adversarial approach to prison discipline but held instead that an inquisitorial model suffices, if modified by formal separation of the witnesses and decisionmakers in the particular case. Formal separation was respected here--for Thompson was not a member of the Board. Baxter v. Palmigiano, 425 U.S. 308 (1976), warns the courts of appeals not to add to the procedures required by Wolff, which, Baxter held, represents a balance of interests that should not be further adjusted in favor of prisoners. Indiana has played by the rules articulated in Wolff. Cf. Edwards, 520 U.S. at 647.

4. Two pieces of confidential evidence were received at the hearing: the Case Report and the videotaped interview with Yvonne Davis. As we have mentioned, White does not protest the confidentiality of the Case Report, but he does contend that

he should have received the tape of the interview with Davis. White believes that lack of access to this tape prevented him from presenting favorable evidence, one of his rights under Wolff. We have some difficulty, however, seeing the linkage. The Board had the tape, so it knew whatever evidence favorable to White the tape contained. The district court, which reviewed the tape, thought it highly inculpatory; but even if it was exculpatory it was before the Board. The only evidence that White wanted to, but could not, present was live testimony of Yvonne Davis. But the reason why he could not present her testimony--that she was no longer an employee of the prison, and the Board lacked compulsory process to require civilians to appear before it--is unrelated to his access to the tape. This makes it difficult to see what is at stake. White is understandably curious about what the tape reflects, but the prison is understandably skittish about revealing an interview that likely discussed prison-security measures about which prisoners are best kept in the dark.

As the district court held, the administrative record contains "some evidence" that White engaged in drug trafficking. See Superintendent of Walpole v. Hill, 472 U.S. 445, 454 (1985). The Board therefore was entitled to take the actions it did, and the petition for habeas corpus was properly denied.

Affirmed

ROVNER, Circuit Judge, concurring in part and dissenting in part. I agree with my colleagues on the procedural points, i.e., that this case is not moot and, further, that 28 U.S.C. sec.2254(d) does not apply to White's habeas petition. Ante sec.sec. 1, 2. I also agree that White was not deprived of due process when he was denied access to the videotape of the interview with Yvonne Davis. Ante sec. 4. I respectfully disagree, however, with their conclusion that Officer Thompson's ex parte meeting with the Conduct Adjustment Board (the "CAB" or the "Board") immediately prior to, and even during, the Board's

deliberations did not deprive White of due process. Ante sec. 3.

Due process entitles a prisoner faced with the loss of good-time credits to certain rudimentary procedural protections. Wolff v. McDonnell, 418 U.S. 539, 555-58, 94 S. Ct. 2963, 2974-76 (1974). These include the right to advance written notice of the charges against him, so that he might know what the charges are and "marshal the facts and prepare a defense," id. at 564, 94 S. Ct. at 2979, and the right (within reasonable limits) to call witnesses and present documentary evidence on his own behalf, id. at 566-67, 94 S. Ct. at 2979-80. A "sufficiently impartial" decisionmaker is also necessary, in order to shield the prisoner from the arbitrary deprivation of his liberties. Id. at 570-71, 94 S. Ct. at 2982; see also Gaither v. Anderson, 236 F.3d 817, 820 (7th Cir. 2000) (per curiam); Merritt v. de los Santos, 721 F.2d 598, 601 (7th Cir. 1983) (per curiam); Redding v. Fairman, 717 F.2d 1105, 1112, 1116 (7th Cir. 1983), cert. denied, 465 U.S. 1025, 104 S. Ct. 1282 (1984); United States ex rel. Miller v. Twomey, 479 F.2d 701, 716, 718 (7th Cir. 1973) (Stevens, J.), cert. denied, 414 U.S. 1146, 94 S. Ct. 900 (1974).

The fact that Thompson was allowed to remain behind in the hearing room with the members of the CAB after White's hearing had concluded was inconsistent with each of these procedural rights. As we have no record of what transpired between Thompson and the Board, we must presume, as my colleagues in fact do, that Thompson and the members of the Board engaged in an ex parte discussion of the charges against White. Ante at 8./1 It is possible that during that exchange, Thompson supplied the Board with additional details about White's behavior, effectively expanding the charges against White. If so, the discussion deprived White of advance notice of those charges. See Wolff, 418 U.S. at 564, 94 S. Ct. at 2978-79; Swank v. Smart, 898 F.2d 1247, 1253 (7th Cir. 1990). Even if the charges were not broadened, and Thompson simply repeated, clarified, or amplified his previous testimony, it would have been as if the Board had reopened the hearing upon White's departure from the room and continued it in absentia, without any

demonstrable basis, such as a security-related concern (see Wolff, 418 U.S. at 565, 94 S. Ct. at 2979), for doing so. By depriving White of the opportunity to meet the case against him, that scenario too would violate due process. See Wolff, 418 U.S. at 566-67, 94 S. Ct. at 2979-80; Swank, 898 F.2d at 1253-54. Even if all that Thompson did was take the opportunity to make a final summation to the Board, the exchange was nonetheless unacceptable. When we hear oral arguments, we do not ask the appellee and his counsel to leave the courtroom at the conclusion of his argument, so that the appellant may make a final, rebuttal argument to us in private; it would be no less of an "extraordinary impropriety" for a Conduct Adjustment Board the Board to grant that privilege to an investigating officer. Id. at 1254.

An ex parte proceeding always presents the risk of an erroneous result, see United States v. Michelle's Lounge, 39 F.3d 684, 699 (7th Cir. 1994); and here it also calls into question the neutrality of the Board itself. Doubtless it is true that the members of a Conduct Adjustment Board, by virtue of their positions within the penal system as well as their day-to-day interaction with and reliance upon correctional officers, are more likely to credit and to empathize with those who, like Thompson, document and present charges against prisoners, see ante at 11; Cleavinger v. Saxner, 474 U.S. 193, 204, 106 S. Ct. 496, 502 (1985); Cluchette v. Procunier, 497 F.2d 809, 820 (9th Cir. 1974), modified on other grounds, 510 F.2d 613 (9th Cir. 1975), and rev'd on other grounds by Baxter v. Palmigiano, 425 U.S. 308, 96 S. Ct. 1551 (1976); and yet the Supreme Court has never indicated that this likelihood alone disqualifies prison officials and staff members from serving as members of the CAB. See Wolff, 418 U.S. at 570-71, 94 S. Ct. at 2982. But there is a qualitative difference between a decisionmaker's familiarity with, and possible predisposition to believe, a witness, and an ex parte conversation between the decisionmaker and the witness about the merits of the case. Thompson was not the FTC's Chief Economist (see ante at 9); he was White's chief accuser. His credibility was a material, if not crucial, factor in the Board's assessment of the charges against White. My

colleagues concede that due process would not have permitted Thompson to serve as a voting member of the Board. Ante at 11; see Whitford v. Boglino, 63 F.3d 527, 534 (7th Cir. 1995) (per curiam) cert. denied, 529 U.S. 1075, 120 S.Ct. 1691 (2000); Malek v. Camp, 822 F.2d 812, 816 (8th Cir. 1987); de los Santos, 721 F.2d at 601; Cluchette, 497 F.2d at 820; see generally In re Murchison, 349 U.S. 133, 136, 75 S. Ct. 623, 625 (1955). Yet, at a critical stage of the process, just after the close of evidence and at the beginning of the Board's deliberations, Thompson had the opportunity to argue the case against White, to spin the facts, to add details that had not emerged at the hearing itself, to try to sway Board members, and even to haggle with them as they began to deliberate--all in the absence of White, an advocate for White, a record, or any other check to maintain the balance between the accused and his accuser that is essential to due process. The ability to influence the Board's decision free of such restraints comes disturbingly close to a vote on White's fate.

Although it is impossible for us to know precisely what effect the ex parte exchange between Thompson and the Board had upon the Board's decision, cf. Simer v. Rios, 661 F.2d 655, 680-81 & n.54 (7th Cir. 1981) (no prejudice shown), cert. denied, 456 U.S. 917, 102 S.Ct. 1773 (1982), its effect on the fairness of the process is self-evident. Secrecy itself is inconsistent with the fundamental tenets of due process. Home Box Office, Inc. v. F.C.C., 567 F.2d 9, 56 (D.C. Cir.) (per curiam), cert. denied, 434 U.S. 829, 98 S. Ct. 111 (1977), cited with approval by Chicago, Milwaukee, St. Paul & Pacific R.R. Co. v. United States, 585 F.2d 254, 263 (7th Cir. 1978); see also Redding, 717 F.2d at 1112. In a real sense, Thompson's private audience with the Board rendered all that had taken place before then a sham, because White cannot know what transpired in that private exchange (let alone respond), and because we ourselves, as a reviewing body, are utterly in the dark as to the substance of the exchange. See HBO, 567 F.2d at 54-55; cf. Simer, 661 F.2d at 680-81 (ex parte contacts between judge and intervenors did not amount to due process violation where contacts were disclosed and plaintiffs were given

opportunity to respond)./2

Strikingly absent from either the record or the State's brief is any justification for the secrecy. It is possible, as my colleagues suggest, that the Board asked Thompson to remain behind at the conclusion of the hearing in order to ask him questions about his confidential Case Report. See ante at 10. But it is equally possible, as my colleagues acknowledge, that Thompson's ex parte remarks to the Board were not confined to subjects that necessitated confidence. See ante at 10. And notably, neither the State nor my colleagues have cited a plausible justification for Thompson's presence during the Board's deliberations. Without at least some record as to the nature of, and need for, the ex parte discussion, we are in no position to judge whether it exceeded the bounds of propriety.

Throwing up our hands in the absence of such a record (see ante at 10) does the Constitution no service. We require prison officials to assemble a record containing "some evidence" supporting the imposition of discipline. Superintendent of Walpole v. Hill, 472 U.S. 445, 454, 105 S. Ct. 2768, 2773 (1985). When a Conduct Adjustment Board decides to question a witness ex parte, I see no reason why it cannot in some manner document the fact that it has done so and why. See Wolff, 418 U.S. at 565, 94 S. Ct. at 2979 (noting that when CAB excludes evidence for security-related reasons, it should note the exclusion); see also Ponte v. Real, 471 U.S. 491, 496-97, 105 S. Ct. 2192, 2195-96 (1985) (due process requires prison officials at some point to disclose reasons for refusal to call witnesses requested by inmate at disciplinary hearing). Furthermore, to the extent the Board relies on the information disclosed in the ex parte exchange, the record also ought to tell us something about the substance of that exchange. Cf. Whitford, 63 F.3d at 535-36 (CAB that relies on testimony of confidential informant must in some way document reliability of informant). Otherwise, the procedural safeguards embraced by Wolff, and for that matter Hill's demand for "some evidence" supporting the discipline, are illusory--the Board may go through the motions of hearing, but ultimately may resolve the case based on non-record

"evidence" to which only the Board and the prisoner's chief accuser are privy. That is the antithesis of due process.

   With respect, I therefore dissent in part from the court's holding today.

FOOTNOTES

/1 It bears mention that at no level of administrative review did anyone in the prison hierarchy, including Thompson himself, deny that Thompson remained in the hearing room with the Board after the hearing had concluded. Only at the final level of administrative review was this issue even acknowledged. At that juncture, an administrative assistant with the Indiana Department of Corrections wrote that "Officer Thompson, while present at the hearing, was not involved in the decision of your guilt or innocence." A.29. The record does not disclose, however, what the basis for that conclusion was. Moreover, even that ruling did not purport to reject White's contention that the Board and Thompson met privately after the hearing, just prior to and even during the Board's deliberations.

/2 Adding insult to injury, the first person within the prison hierarchy to review White's grievance regarding the ex parte contact between Thompson and the Board was none other than Thompson himself. See A.23. Thompson did not deny White's allegation on the grievance form that Thompson was "present during the deliberation of the decision of guilt or innocent [sic]," A.23, but simply wrote in response that as the investigating officer he had a right to attend and participate in the hearing and that "all I'm doing is my job, that was placed before me." A.23-24. Of course, "no man can be a judge in his own case." Murchison, 349 U.S. at 136, 75 S. Ct. at 625. As White's accuser, and as a participant in the ex parte exchange with the Board, Thompson was ill-situated to review the propriety of the exchange. His role in the resolution of White's grievance rendered the initial level of administrative review meaningless.